24 A.3d 747

**In re ADOPTION/GUARDIANSHIP OF CROSS H.**

**No. 1987, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

July 21, 2011.

Nenutzka C. Villamar (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Constance J. Ridgway (Wakefield & Ridgway PA, on the brief), Woodstock, MD. Ann M. Sheridan (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WOODWARD, WRIGHT and MATRICCIANI, JJ.

MATRICCIANI, J.

Appellants Virginia H. and Aaron R. appeal the judgment of the Circuit Court for Howard County terminating their parental rights in their biological son, Cross H., and granting guardianship of the minor child to the Department of Social Services. Appellants present three questions on appeal:

 I. Did the circuit court err in terminating appellants' parental rights when an appeal of the underlying

CINA order changing the minor child's permanency plan to adoption was pending?

II. Did the circuit court err in refusing to consider placement of the minor child with his paternal grandmother?

III. Did the circuit court err in terminating appellants' parental rights?

For the reasons set forth below, we shall answer these questions in the negative, and we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

Cross H., a minor child, was born to appellants Virginia H. and Aaron R. on August 28, 2007 at Johns Hopkins Hospital.[1] He was born after only thirty one weeks of gestation, and he was exposed prenatally to HIV and hepatitis-C.[2] Because of Virginia H.'s history of drug and alcohol use, there is a high likelihood that pre-natal exposure to drugs and alcohol also occurred. At birth, Cross H. had damage to his retinas, difficulty breathing, heart arrhythmias, and poor muscle control. He was anemic, and weighed less than four pounds. As a result, Cross H. remained in the Johns Hopkins pediatric intensive care unit until September 10, 2007. He was then transferred to the Mt. Washington Pediatric Hospital, where he remained until October 3, 2007.

Appellee Virginia H. has multiple psychiatric conditions for which she has been hospitalized on several occasions. Virginia H. was admitted to the psychiatric unit of Johns Hopkins Hospital shortly after Cross H.'s birth, but while he was still

---

1. The identity of Cross H.'s father was still unknown at the time of his birth. Two possible fathers had been identified, but neither had responded to correspondence sent to their last known addresses. In December of 2008, a DNA paternity test was done, and in January of 2009, Aaron R. was identified as the father.

2. Because appellee Virginia H. is HIV-positive, Cross H. was delivered via cesarean-section.

in the neonatal intensive care unit, appellee left treatment due to a "difference in opinion" about the proper course of her medical and psychiatric treatment. On October 3, 2007, the day of his release from Mt. Washington Hospital, Cross H. was adjudicated a Child In Need of Assistance ("CINA").[3] He was committed to the Department of Social Services ("the Department"), and was placed in foster care with Mr. and Mrs. B.[4]

Cross H. remained in foster care with Mr. and Mrs. B's family for approximately seven months. In the spring of 2008, Mr. and Mrs. B. experienced a medical emergency which made it impossible for them to continue caring for Cross H. Therefore, Cross H. was placed with Christopher D. and David A., who had taken training courses to become licensed foster care providers. Cross has been living with Christopher D. and David A. (hereinafter "the foster family") since that time.

Virginia H. was incarcerated for a period of time after Cross H.'s birth, and upon her release, she entered Fayette Health and Rehabilitation Center, where she remained from June 18, 2008 until May 7, 2009. She then went to live with her husband, whom she met and married during her time at the rehabilitation facility. As of September 2010, Ms. H. resided in a two-bedroom house in Baltimore City with her husband and her mother. Ms. H. has four children, none of whom are in her custody.

---

**3.** A "Child in Need of Assistance" is a child who requires court intervention because he or she has been abused, neglected, has a developmental disability and/or a mental disorder, and his or her parents, guardian, or custodian, are either unwilling or unable to provide proper care and attention to the child and the child's needs. Md.Code (1974, 2006 Repl.Vol.), § 3–801(f) of the Courts & Judicial Proceedings Article.

**4.** In anticipation of Cross's release from the hospital, the Department had initially arranged for foster care with Christopher D. and David A. In discussions with appellee, the Department was made aware of Mr. and Mrs. B, who had adopted Cross H.'s cousin and with whom Virginia H. had a relationship. Therefore, Cross H.'s placement plan was changed to facilitate a continued relationship with his mother.

Appellant Aaron R. was determined to be Cross's biological father in January of 2009. Once paternity was confirmed, Cross H.'s permanency plan was changed to reflect the goal of reunification with his father. Although the father did complete a parenting course, he did not follow-through with the Department's request for completion of an inpatient drug treatment program until court-ordered to do so, and he did not complete the requested psychological examination. In March of 2009, Mr. R. requested that Cross H. be placed with his grandmother, Barbara J., until he could "get himself together." Aaron R. acknowledged that he was not a viable placement option for Cross H. at that time, and that it was unlikely that he would be able to care for the child in the near future.[5] As of August of 2010, Aaron R. was still living with his mother—the paternal grandmother.

On April 29, 2009, based on Virginia H. and Aaron R.'s requests, the circuit court ordered that Cross's permanency plan be explored for placement with the paternal grandmother, and ordered the Department to conduct a home study and a bonding study. These studies resulted in negative findings regarding placement with Barbara J. Based on these findings, on October 28, 2009, the juvenile master recommended that Cross's permanency plan revert to non-relative adoption.

Appellant Virginia H. filed exceptions to the permanency plan, and the court conducted an exceptions hearing on December 7 and 16, 2009 and on February 17 and 18, 2010. At the conclusion of the hearing, the circuit court delivered an extensive oral opinion, explaining the court's conclusion that neither Ms. H., nor Mr. R. were available as current placements for Cross H. Accordingly, the juvenile court entered an order on March 26, 2010, in which it dismissed the mother's

---

**5.** Mr. R has also had several encounters with the criminal justice system: a 2000 conviction for distribution of crack cocaine, a 2001 conviction for making a false statement to a police officer, two 2002 convictions for possession of a controlled dangerous substance and unauthorized use, as well as convictions for tampering with automobiles, trespassing, possession of marijuana, attempting to distribute marijuana, and assault involving a police officer.

exceptions, and ordered a permanency plan of non-relative adoption, affirming the master's recommendations.

The mother timely noted an appeal of the CINA case with our Court. While the CINA appeal was pending, in compliance with the circuit court's March 26th order, the Department filed a petition to terminate parental rights ("TPR petition"). On June 24, 2010, Barbara J. filed a motion to intervene, which the circuit court denied. On August 10, 2010, Aaron R. filed a motion to stay the TPR proceedings in the juvenile court until the appeal of the CINA order had been resolved. The juvenile court denied the motion to stay and proceeded with the TPR hearing, which spanned a period of five days from September 28, 2010 until October 4, 2010. At the conclusion of the hearing, the court granted guardianship of Cross H. to the Department, and terminated the parental rights of Virginia H. and Aaron R.

Along with its appellate brief in the CINA appeal, the Department also filed a motion to dismiss the CINA appeal as moot, arguing that the court's October 4, 2010 order terminating appellants' parental rights effectively ended the circuit court's jurisdiction in the CINA case. On January 11, 2011, we denied the motion to dismiss, and we affirmed the juvenile court's CINA decision, including the change in permanency plan.[6] On February 9, 2011, appellant filed a petition for writ of certiorari to the Court of Appeals in the CINA case. The petition was denied on April 25, 2011.

On October 22, 2010, Virginia H. noted her appeal of the TPR case, and on November 2, 2010, Aaron R. did the same. Additional facts will be provided as necessary.

### DISCUSSION

### I.

■ Appellants contend that the circuit court erred in proceeding with the termination of parental rights hearing

---

6. *In re: Cross H.,* Unreported Opinion No. 0440, September Term 2010 (filed January 11, 2011).

when the appeal of the CINA order was pending. On April 25, 2011, however, while the present TPR appeal was pending before this Court, the Court of Appeals denied appellants' petition for a writ of certiorari in the CINA case.[7] Therefore, appellants' argument is moot.

Nonetheless, appellants urge us to decide this issue, arguing that it involves an important matter of public concern that may frequently recur. We note that a different twist on the present procedural argument was addressed in our opinion in the CINA proceedings. *In re: Cross H.,* Unreported Opinion, No. 0440, September Term, 2010.

In order to clarify our comments there and to provide some guidance on the interplay between CINA proceedings and TPR cases, we will discuss briefly the point raised by appellants here.

Appellants cite *In re: Emileigh F.,* 355 Md. 198, 733 A.2d 1103 (1999), in which the Court of Appeals held that the circuit court erred in closing a CINA case while an appeal was pending. Appellants argue that the present case is analogous to *Emileigh F.* and that we should vacate the circuit court's grant of the TPR petition. We disagree. The situation in *Emileigh F.* was notably different from the facts of the present case. There, the mother appealed her daughter's adjudication as a CINA. We affirmed, and the Court of Appeals granted certiorari. While the case was pending before the Court of Appeals, the juvenile court granted the Department's motion for an order of recision and termination of juvenile court jurisdiction, effectively closing the CINA case. The Court of Appeals held that this action was inconsistent with the pending appeal, and vacated the judgment closing the CINA proceedings. In the present case, on the other hand, when the TPR case was heard, the CINA appeal was pending before this Court. No action was taken to close the CINA case proceedings.

---

7. *In re: Cross H.,* Petition Docket No. 626.

 While a CINA adjudication must precede a TPR determination, it is a separate legal proceeding. Moreover, the changing of the permanency plan from reunification, or adoption by a relative, to adoption by a non-relative, is not required before the Department can file a TPR petition. Thus, we see no error in the actions of the circuit court in the present case.

A different panel of this Court was confronted with a motion to dismiss the appeal of the CINA case earlier in these proceedings because the State believed that the juvenile court's order terminating appellants' parental rights rendered that appeal moot. Judge Wright, writing for the Court there, also distinguished the present case's procedural posture from that in *Emileigh F.*, but noted that, by operation of statute, the TPR order "has the legal effect of extinguishing the CINA case," citing FL 5–325(a)(1) and (4) and FL 5–324(b). While denying the motion to dismiss, we went on to address the CINA appeal issues, because a legal error in those proceedings could have infected the TPR determination. We were also concerned about violating the admonition in *Emileigh F.* against authorizing juvenile courts to "act to frustrate the actions of an appellate court." 355 Md. at 202, 733 A.2d 1103.

 Thus, in any given juvenile case, the CINA determinations and the TPR adjudication are inexorably linked. Most often, a change in permanency plan away from reunification with the child's parents sets the stage for a TPR petition. Also, as noted in Judge Wright's earlier opinion in this case, our statutory scheme recognizes that an order of guardianship terminates a CINA case. But *Emileigh F.* teaches us that an appellant's right to challenge those very CINA determinations cannot be defeated by the juvenile court's actions in the CINA proceedings themselves.[8] Appellants' objection to those rul-

---

8. *In re: Emileigh F.* followed other Maryland decisions holding that a trial court's post-appeal orders which affect the subject matter of the appeal are prohibited. *Id.*, 355 Md. at 202–03, 733 A.2d 1103.

ings remained alive here until their final appellate entitlement was exhausted by the Court of Appeals' denial of their petition for a writ of certiorari.

█ Conversely, there is no prohibition against the initiation of TPR proceedings during the pendency of a CINA appeal. As indicated above, while related, the actions are independent of one another. CINA proceedings are governed by CJP 3–801, et. seq. and TPR proceedings are governed by FL 5–313 et seq. Therefore, despite the fact that appellants' claim of error here was mooted by the action of the Court of Appeals, we are unpersuaded that the pendency of the CINA appeal was a bar to the TPR case proceeding in the circuit court.

## II.

█ Appellants next contend that the circuit court erred in "refusing to consider ordering custody of Cross H. to his grandmother." This argument is based on the court's denial of the motion to intervene in the TPR proceedings filed by Barbara J., Cross H.'s paternal grandmother, and its rulings at the TPR hearing limiting the admission of evidence regarding Barbara J.'s suitability as a placement for Cross H.

The juvenile court *did*, however, consider placement of Cross H. with his paternal grandmother. In April of 2009, acting in accordance with Virginia H. and Aaron R.'s wishes, the court ordered that Cross H.'s permanency plan be explored for placement with Barbara J. To this end, the Department conducted a home study and a bonding study to determine whether Ms. J or either of Cross H.'s biological parents would be viable placement options. These studies resulted in negative findings regarding placement with the paternal grandmother. Madeleine Krebs, the Department's social worker, testified at the TPR hearing that she observed the interaction between Cross H. and Ms. J. on several occasions, and that she did not see evidence of significant bonding or any sign of attachment. Ms. Krebs also testified that she considered the social and financial situation of Ms. J. (as well as the

birth parents), and she opined that Ms. J. did not represent a long term resource for Cross H.[9] These considerations were explicitly referenced by the circuit court in its oral ruling.[10] Moreover, we believe the circuit court was correct in noting that the appropriate focus of the TPR hearing was not the potential suitability of the paternal grandmother as a placement for Cross H.—as this was an issue properly addressed in the CINA case—but rather, the fitness of Virginia H. and Aaron R. as parents.

## III.

■ Appellants' final contention is that the juvenile court erred in terminating their parental rights, citing the "fundamental interest" of natural parents in the "care, custody, and management" of their children, and emphasizing the "strong presumption" in favor of custody by the natural parents.

■ When the State seeks to terminate parental rights without the consent of the parent(s), the standard is whether the termination of rights would be in the best interests of the child. Md.Code (1984, 2006 repl. vol.), Family Law Article ("FL") § 5–323. *See Washington County Dep't of Social Services v. Clark*, 296 Md. 190, 198, 461 A.2d 1077 (1983). To determine what is in the child's best interest, the court must consider the factors enumerated in FL § 5–323(d), which provides:

---

9. Ms. Krebs was accepted as an expert in the field of psychiatric social work, and was thus qualified to render opinion testimony under Maryland Rule 5–702.

10. The circuit court further explained its reasoning, stating:

> [. . .] There are exceptional circumstances about [Cross H.'s] premature birth and his medical issues that will always be a part of his current [situation] and his future. Transitions are a concern and the ability to meet his special needs [is] a concern.
>
> Part of the proposal involving Ms. Jones was that Ms. Jones would have the child until Mr. R. is capable of being the parent that is envisioned in these cases … [but] if that was the way it went, that would just simply be yet another transition [for Cross H.]. If Ms. Jones was looked at as the resource while we waited for Ms. [H.'s] situation to solidify, it would be the same problem.

(d) Considerations. Except as provided in subsection (c) of this section, in ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:

(1) (i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;

(ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;

2. the local department to which the child is committed; and

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the

juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) (1.)(A.) on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or (B.) upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and (2.) the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in § 5–1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:

A. a minor offspring of the parent;

B. the child; or

C. another parent of the child; or

2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(4) (i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to:

1. community;

2. home;

 3. placement;
 4. school;

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.

The Court of Appeals explained the juvenile court's role in *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 501, 937 A.2d 177 (2007):

> The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how. If the court does that—articulates its conclusion as to the best interest of the child in that manner—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

The standard of review on appeal is more limited. In reviewing a circuit court's decision to terminate parental rights, we must "ascertain whether the [court] considered the statutory criteria, whether its factual determinations were clearly erroneous, whether the court properly applied the law, and whether it abused its discretion in making its determination." *In re Adoption/Guardianship/CAD No. 94339058*, 120 Md.App. 88, 101, 706 A.2d 144 (1998). We explained in *In re Abiagail C.*, 138 Md.App. 570, 772 A.2d 1277 (2001):

> On review, our function ... is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to

support the chancellor's determination that it would be in the best interest of [the child] to terminate the parental rights of the natural [parent]. In making this decision, we must assume the truth of all the evidence, and of all of the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court.

*Id.* at 587, 772 A.2d 1277 (citing *In re Adoption No. 09598*, 77 Md.App. 511, 518, 551 A.2d 143 (1989)).

At the conclusion of the TPR hearing, the circuit court made findings of fact on each of the applicable § 5–323(d) factors:

With regard to Cross H.'s health and safety, the court found that he was born prematurely and underweight, having been exposed to HIV and hepatitis-C; that he was born with severe medical issues from a lack of prenatal care, and from the mother's continued use of alcohol and drugs throughout her pregnancy; and that he had, and continues to have, significant physical and developmental delays.

With regard to services offered to parents, the court noted that Virginia H. completed the required psychological evaluations, as well as a parenting education program. As to Mr. R., although he completed a parenting course, the father refused to undergo drug treatment or substance abuse counseling. The court also noted Mr. R.'s criminal record, his continued drug and alcohol abuse, his inability to maintain gainful employment, and his lack of stable housing, as negative factors making him unfit as a parent. The court found, as to both parents, that no testimony or evidence had been presented that additional services would be likely to bring about a positive change in Ms. H.'s or Mr. R.'s situation.

With regard to the existence of a parental disability that makes the parent consistently unable to care for the child's immediate needs, the court noted Ms. H.'s bipolar disorder and her reluctance to undergo treatment or discuss medication, based on the testimony of Dr. Parker, who performed Ms. H.'s psychiatric evaluation, and Ms. Krebs, the social worker assigned to the case. This testimony, and Ms. H.'s own admissions, led the circuit court to find that no acceptable

treatment plan was in place for Ms. H.'s bipolar disorder, that no acceptable support network had been presented, and that no evidence had been shown to suggest that Ms. H. had committed herself to following a structured treatment plan, all of which made her unable to parent Cross H.

With regard to the contact maintained between the parents and the child, and with the Department, the court found that while regular visitation had occurred between Cross H. and Ms. H., visitation with Mr. R. had been more sporadic. The court also noted that the Department arranged visitation between Cross H. and appellants (as well as Ms. J.), and that it kept the parties aware of the child's development.

With regard to the child's emotional ties and feelings, Ms. Krebs, who conducted home studies and bonding studies between Cross H. and Virginia H., Aaron R., and Barbara J., testified that she did not observe a strong bond, or any signs of attachment,[11] between Cross H. and his biological parents or grandmother. Ms. Krebs did observe strong attachment between Cross H. and his foster parents, however, and noted that he seemed to be very well adjusted to his foster home. The court also noted that Cross H. demonstrated "behavior occurring at the times of visitation that suggest[s] transition . . . was stressful for him." In conclusion, the court found that Aaron R. was not fit to remain in a parental relationship with Cross H. With regard to Virginia H., the court concluded that exceptional circumstances existed that would make the continuation of the parental relationship detrimental to Cross H.'s best interests.

Based on the evidence in the record, we believe that the circuit court properly considered the applicable statutory criteria, and that ample evidence supported the court's factual findings. These findings provided clear and convincing evidence of parental unfitness with regard to Aaron R., and of

---

11. Attachment, according to Ms. Krebs, is the result of continued development of a strong bond between parent and child, where reciprocity exists and the child demonstrates seeking out comfort and safety with the parents.

the existence of exceptional circumstances with regard to Virginia H., and this evidence was sufficient to overcome the presumption in favor of maintaining the natural parental relationships. Thus, we hold that the circuit court did not abuse its discretion in terminating appellants' parental rights.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**