REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2213

September Term, 2013

_____

IN RE:

ADOPTION/GUARDIANSHIP OF

K'AMORA K.

_____

Woodward,
Nazarian,
Reed,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  August 1, 2014

The Circuit Court for Baltimore City terminated Keisha K.'s ("Mother") parental rights vis-à-vis her daughter, K'Amora, via a rarely used analytical path: the court found by clear and convincing evidence that "exceptional circumstances" justified the termination of Mother's parental rights and that termination served K'Amora's best interests, without deciding whether or not Mother was unfit to serve as her parent. After a hearing (the "TPR Hearing"), the court grounded its finding of exceptional circumstances in: (1) Mother's refusal to allow physicians to administer medication to K'Amora after she was born exposed to human immunodeficiency virus ("HIV"); (2) nearly two years of comprehensive but unsuccessful efforts by the Baltimore City Department of Social Services ("DSS") to involve Mother in K'Amora's life and assess Mother's ability to parent her; (3) Mother's historical inability to provide a safe environment for her other children; and (4) K'Amora's positive and healthy experience with her foster family. Mother challenges the termination decision and we affirm.

## I. BACKGROUND

K'Amora was born on February 16, 2012 and, as the testimony at the TPR Hearing revealed, needed help immediately. As social worker Catherine Miller testified, right after K'Amora's birth Mother—who was HIV-positive and had a "high HIV viral load" at the time—refused HIV medication for herself and for K'Amora, even though doctors advised her that K'Amora's risk of contracting HIV from *in utero* exposure would fall "almost

down to zero" with treatment. To compound the problem, Mother expressed irrational and inconsistent reasons for refusing treatment:[1]

> [S]ometimes she would tell us that she didn't want to take the medications because she needed to take them on a full stomach. . . . And then the next time the medications were due, she would say that she couldn't take them because she needed to take them on an empty stomach. And the conversations would just go around and around, with no successful outcome.

Mother acted erratically in the hospital in other ways. She called the police to the hospital at least three times, claiming that the staff were "trying to kidnap her baby, and lying about her." Because of concerns about K'Amora's safety, hospital staff placed a "sitter" (a "professional who sits in the room to ensure . . . the baby's safety") in Mother's hospital room. Ms. Miller summed up Mother's disposition by describing her as "argumentative, irrational and difficult to work with," and hospital staff ultimately called DSS for an Emergency Family Involvement Meeting ("FIM").

Tricia Fayall, a child protective service worker at DSS, received Ms. Miller's report and oversaw the FIM at the hospital, the result of which was that "because of [Mother's] mental state, . . . we thought that it would be best for [K'Amora] to go into foster care." It would be an understatement to say that the FIM did not go smoothly: "[Mother] called the police on us, while we were there. And then she called the police on the police, while we were there." Mother evidently believed that Ms. Fayall (or hospital staff, it's not clear which) were "trying to take her baby . . . right then and there," but

---

[1] Mother also refused to allow a home nurse to administer medication to K'Amora after discharge, and occasionally (but not consistently) expressed doubt that K'Amora had been exposed to HIV in the first place (which she indisputably had).

2

called the police a second time because she felt that the responding officers were not "doing their job."

Six days after K'Amora was born, DSS placed her in the care of a foster family,[2] and Mother had weekly supervised visitation opportunities. Priscilla Iwuanyanwu, the assigned case worker beginning in March 2012, oversaw K'Amora's placement and visits with Mother; she knew Mother because she had also overseen the care of Mother's three other children, whom we discuss below. Unfortunately, Mother's erratic behavior continued. Of her sixty-one scheduled visits with K'Amora, she missed twenty-seven. She changed her phone number frequently and never kept DSS abreast of her whereabouts. And although Mother signed two service agreements with DSS, she refused to sign the third, which would have run from February 26, 2013 to August 29, 2013.

The visits Mother did attend failed to blossom into a healthy parent-child relationship. When K'Amora cried at visits, and she often did, Mother became angry, frustrated, and confused. Mother expressed reluctance to take K'Amora out of her car seat and was known to leave a visit early if K'Amora did not settle down quickly. As K'Amora advanced from infancy to toddlerhood, Ms. Iwuanyanwu saw no bond form

---

[2] The procedural history leading up to the TPR hearing followed the normal course and is not at issue here. K'Amora entered foster care pursuant to an emergency shelter order, after which DSS filed a petition to have K'Amora declared a "Child in Need of Assistance" ("CINA") that the juvenile court granted on June 26, 2012. *See* Md. Code (1974, 2013 Repl. Vol.), § 3-801(f) of the Courts & Judicial Proceedings Article ("CJ"). After originally entering a permanency plan aimed at reunification with Mother, a juvenile master recommended on April 17, 2013 that the plan change to adoption by a non-relative, and the juvenile court adopted that recommendation on July 22, 2013. As required, DSS filed a Petition to terminate Mother's parental rights on May 15, 2013, and the TPR Hearing took place on November 12, 2013.

3

between them, and expressed concern that Mother took pictures of K'Amora rather than interacting with her. At one point, Mother even seemed to deny being K'Amora's mother:

> Most of the time she comes to visit, she's kind of quiet. She don't say nothing. If I try to tell her to try to interact with her child, *she would tell me, well, it's your child. That's not my child. I'm just here to visit.*

(Emphasis added.) Mother's behavior at visits ranged from quiet to volatile; at one point she accused Ms. Iwuanyanwu of hitting K'Amora, and on another occasion suggested that K'Amora's foster mother had been breast-feeding her (even though she had no reason to think this was the case). Ms. Iwuanyanwu expressed frustration that Mother seemed to make no effort to bond with her daughter, and DSS remained uncomfortable with the prospect of K'Amora living with her.

Sharmika Spence, a Team Administrator with DSS, covered for Ms. Iwuanyanwu and supervised two of Mother's visits with K'Amora. In January 2013, Mother complained at a visit that K'Amora was upset and crying because her hair had been styled too tightly (even though Ms. Spence didn't believe that was the case). Ms. Spence recalled that Mother "seemed to not know what to do" in response to K'Amora's crying. Although K'Amora ultimately settled down, Ms. Spence expressed the belief that she did so because she "wore herself out," not because Mother succeeded in comforting her. Ms. Spence saw "no observation of a real bond of how a child would respond when they are familiar with someone and can be consoled."

Ms. Spence supervised another visit in which Mother not only couldn't connect with K'Amora, but blamed her crying on her foster parents' neglecting to feed her—even

4

though Ms. Spence observed that K'Amora was of an appropriate height and weight, and DSS never had any concerns about her health or the quality of her foster family's care. Mother ended that particular visit early, and Ms. Spence observed that Mother again seemed unable to handle K'Amora's fussiness. Ms. Spence also related an episode in which Mother called her into a visit and complained about a bruise on K'Amora's thigh that the social worker explained came from an immunization. Mother insisted that the bruise resulted from abuse at the hands of K'Amora's foster parents, and she contacted police. The police then required that a physician investigate, and Child Protective Services ruled out the possibility of any abuse (consistent with K'Amora's medical records, which showed a recent immunization).

Overall, Ms. Spence questioned Mother's "ability to parent K'Amora safely":

> I have concern about her, about the bond with the child. During visits there are times when I have been called in to a visit because [Mother] will not talk to the child, will not touch the child. And that's a concern for [DSS].

> Because if you're displaying that kind of behavior or actions in a . . . place where you know you're being monitored, then when you're at home I'm not sure that you're going to be displaying some loving care and affection for this child, if they are not reacting to you in a way in which you think they should.

> And [Mother] has shown that she cannot . . . reconcile two thoughts. So when I say that K'Amora doesn't respond to her in a way that maybe a child who's been with their mother all along would respond. And I try to explain to [Mother] that this is why we have to continue to have visits, so that she becomes familiar with you, and things like that. She's . . . it seems that she can't bring the two together.

And she becomes upset with the child because she doesn't respond to her.

Mother also expressed to Ms. Spence the belief that DSS was "playing mind games with her, that the worker is jealous of her. And that's why she doesn't want to give her child back. Because the worker wants the child." Ms. Spence testified that Mother's mental health issues were the greatest impediment to reunification. Mother told Ms. Spence that she went to therapy only to mollify DSS, and Ms. Spence was concerned that Mother would not seek any mental health treatment at all if she got K'Amora back. In their several FIMs, Ms. Spence found Mother combative, resistant to therapy or to addressing her mental health issues, and completely unwilling to consider taking medication.

Indeed, Mother's mental health was a recurring theme throughout the TPR Hearing. Mother's therapist, Deborah Wells Lane, testified that Mother would not accept medications to treat her diagnosed "major depression disorder." Mother's attendance at counseling sessions was "inconsistent," and as of the date of the TPR Hearing, Mother had not appeared for a session for over five months. Because of her sporadic attendance, Ms. Lane described her improvement as "slight. . . . [I]t was really still in the beginning stages." (Her treatment goals included developing coping skills, learning to manage the symptoms of her depression, and getting into a daily routine.) Much like Ms. Spence, Ms. Lane believed that Mother only attended treatment in order to try to get K'Amora back. And Ms. Iwuanyanwu testified that although Mother agreed in services agreements to provide documentation of her mental health visits, she never did so, and when Ms.

6

Iwuanyanwu confronted Mother, she would claim that her therapist was lying about her failure to appear.

Mother's history with her other children, especially with her oldest daughter ("Sister"),[3] revealed prior incidents of neglect and abuse that several of the witnesses at the TPR Hearing corroborated. The juvenile court declared Sister a CINA in July 2011, when she was thirteen years old, after it found that Mother had beaten Sister with an extension cord, and Sister reported that Mother had punched and slapped her. But Sister repeatedly fled foster homes and returned to Mother, leading DSS to let her remain with Mother in spite of the abuse. (Although this seems counterintuitive, DSS thought it best for Sister to live with Mother because her case worker would know where she was and because, unlike K'Amora, Sister was old enough to report any further abuse or neglect.[4]) Mother's two other children were in the care of their respective fathers and, therefore, not formally declared CINA, but Ms. Iwuanyanwu had been their DSS case worker as well, and the record contained evidence that raised serious questions about Mother's ability to provide a safe environment for any of her children.[5]

_____

[3] Both Mother and DSS abbreviated the eldest daughter's name because they feared that its uniqueness might reveal the family's identity.

[4] Ms. Iwuanyanwu explained that Sister would "go AWOL" from foster care almost weekly, returning to Mother or to her grandmother. At one point Sister reported being raped after she had run away from a foster home, and DSS preferred knowing that she was with Mother, where she could call DSS for help, rather than in limbo and on the run.

[5] Some of the DSS reports admitted in this case covered the family as a whole. Among other things, these records revealed that K'Amora's brother did not attend school for a time in 2010, when he was about nine or ten years old, and that another sister had received treatment for gonorrhea when she was seven or eight. (We have inferred the children's approximate ages from the briefs.)

Mother, on the other hand, viewed DSS's lesser-of-two-evils decision to allow Sister to remain with her as acknowledging her ability to care for K'Amora:

> [Mother] would say, I know how to care for my own child. If you think I'm not good enough for K'Amora, why did you send [Sister] home? There was so many time she had threaten that she bringing [Sister] back to us. She said [Sister] doesn't listen, she's stubborn, she don't go to school.

Ms. Spence differentiated K'Amora's situation from Sister's primarily by their age difference:

> At K'Amora's age it's important that she understands that there's going to be an adult present to meet her need, at the point she notifies us that there is a need to be met. And because she talks very little, her way to let someone know that she has a need is to cry.
>
> And if an adult around her is not able to console her, it internally creates something in the child that she's not going to be, her needs are not going to be met. And so, of course, that can produce things later on in life.
>
> And so our concern is [Mother's] ability to meet her needs, to console her. To find out what is wrong with her, and to be able to address it at the time.

Both Ms. Spence and Ms. Iwuanyanwu recommended that the court terminate Mother's parental rights. Ms. Spence agreed with counsel for DSS that Mother was "in control of the barriers to reunification," and that she had failed to take "any steps to remove those barriers," despite DSS's efforts:

> We have worked with [Mother] for some time towards reunification, without progress. . . . I have personally pleaded my case with her, with regard to just addressing the things that she needs to address, so that she can have her child back in her care, as she said she would like. And *it just has not moved forward*.

8

> I have grave concerns about her mental health and her ability to maintain K'Amora's safety and well being. And *I don't think that* at this time, or at any time in the near future, if [Mother] does not address her mental health, that *she will be able to maintain K'Amora's well being*.

Ms. Iwuanyanwu likewise opined that the court should terminate Mother's parental rights because Mother was not following through with her service agreement, her court-ordered mental health treatment, or visits with K'Amora. She also stated that K'Amora viewed her foster parents as her parents, and that she felt safe and well-cared for with them.

K'Amora's foster mother, Betty R. ("Ms. R."), then testified about the care she provided to K'Amora right after her birth and about K'Amora's life in the R. Family's home. K'Amora had received all of her medications and was HIV-free at the time of the TPR Hearing. Ms. R. and her husband have two adult children (a son, forty-one, and a daughter, thirty-eight), two adopted children (a son in college and a daughter who was five years old at the time of the hearing), and also are foster parents to a boy about K'Amora's age. Ms. R. described K'Amora as a "very loving," and "very friendly, very happy" child. As she put it, her foster son and K'Amora were like siblings and played very well together. K'Amora also had good relationships with Ms. R.'s other children and grandchildren. Ms. R. described K'Amora's involvement with church activities and considered her very much a part of the R. Family.

Mother also testified at the TPR Hearing, after suggesting initially that she would not. Mother claimed that she had attended all of her visits with K'Amora, cancelling "maybe like two times," and only because she had to go to therapy. She denied ever being

told she needed medication for mental health issues. She contended that she went to therapy even though she was not depressed, and she denied ever telling Ms. Iwuanyanwu that she wanted to change therapists because hers was not telling the truth.

Mother also professed the belief that DSS workers and the R. Family were harming K'Amora. She recalled finding a lump on K'Amora's thigh during a visit, and on another occasion saw "pinch marks" on her leg, but did not report these to anyone because "[t]hey all know what they doing to the child." She claimed Ms. Iwuanyanwu would not permit her to take pictures of K'Amora to document the latter incident. When asked about K'Amora's crying during visits, Mother suggested that K'Amora wanted to stay with her and would not have reason to cry if she were in Mother's care:

> I mean if she cries, well she's 2 now. If she cries it's because she could be hungry or just sleepy or just tired. It could be anything.
>
> The hospitals—usually when my children cry a lot, it could be that they might be hungry or need to be changed. But she's not a baby, she's a toddler now. So it's different from a baby.
>
> When a baby cry, like [Sister's] son, when he cries and cries and cries, I know that he's teething. So it could be multiple things for a child to cry. But if it's a sever—severe cry I know that she probably just want to go—if I had her—if the Judge order for her to come back I probably—She probably—But she know who I am so it wouldn't be no reason and she's not in school.
>
> It's not like she don't know who I am and not want to stay with me. She knows I'm her momma.

In response to questions from the court, Mother denied refusing to give K'Amora medication at the hospital, denied that she had refused to pick up K'Amora at visits, and

10

denied ever having seen a bruise on any of her children like the bruise on K'Amora that she reported to police after a shot at a physician's office.

After closing arguments, the judge ruled from the bench and, in a decision that covered more than fourteen transcript pages, granted DSS's petition to terminate Mother's parental rights:

*First*, the court found that Mother had been "uncooperative" in the hospital after K'Amora's birth, that she had refused medication for herself and for K'Amora, and that her behavior overall was "strange."

*Second*, the court addressed the quantity and quality of her visits with K'Amora and found that she missed 27, or 45%. The court characterized Mother's behavior overall as "inconsistent": "The operative word that comes with regard to the efforts of [Mother] to reunify with [K'Amora] is inconsistent. She's inconsistent with her total health care therapy. She's inconsistent with her visitation with [K'Amora]." The court also found that Mother repeatedly had not attended or completed other services that DSS offered her, such as parenting classes, and she had not kept DSS apprised of her whereabouts. And the court found that when Mother *did* attend visits, they were not positive experiences for her or for K'Amora:

> There would be combativeness between Mother and worker. There would be a lack of engagement between Mother and child. Workers would testify that at [one] point [Mother] was not even talking with the child and not even engaging with the child. Even when prompted to do so even by the workers who may have been present. Or her own mother who was present once or twice trying to mimic that which you do in order to console and engage with your own child.

11

*Third*, the judge expressed concern that Mother's history with her other children, especially Sister, demonstrated an inability to care adequately for the one (older) child who *was* in her care. And the court noted that DSS had provided services to Mother for K'Amora's other brother and sister too, and that a CINA adjudication had only been avoided for them because their fathers had "stepped in and taken [Mother's] place."

*Finally*, the court contrasted K'Amora's foster family, where the older children "appear to be on paths of success," and where K'Amora had adjusted and was learning from her foster-sister. As the court put it, "[f]rankly, all of this child's ties are to her foster family." The court found that terminating Mother's parental rights "would free [K'Amora] to be reared and raised in what . . . [t]his Court considers to be, a stable home with children who are similarly situated. With experienced parents who have provided stability in the past for children who are similarly situated." Although the court conceded that the issue of K'Amora's medications had since been corrected, it still viewed as potentially harmful a decision *not* to terminate Mother's parental rights, explaining that "[t]o uproot this child now would probably traumatize this child. *And she has never been in her mother's care.*" (Emphasis added.)

In light of these facts, the court found that "exceptional circumstances" justified terminating Mother's parental rights:

> Would it be an unacceptable risk to return this child to [Mother] who has shown inconsistencies and a lack of stability and, in some respects a lack of even caring for herself, much less a 21-month-old child. I think those inconsistencies and that lack of stability almost has a geological effect on this case. Because when it comes to issues of termination of parental rights we're talking about

pressure over a period of time. And this period of time, *from the date that the child was born to today's date, and the efforts of the mother to prepare herself to have her child back, the efforts failed.*

*So the Court finds that there are exceptional circumstances* in this case that will preclude this Court from returning [K'Amora] to [Mother]. This young child K'Amora is doing well. This young child K'Amora only knows Mr. and Mrs. R. as her mother and father. And only knows her extended family as her family.

So the Court finds that it would be rather unacceptable and *an unacceptable risk and detrimental to the best interest of the child to continue this parental relationship.*

Whether [Mother] is an unfit parent or not by clear and convincing evidence, that's a little bit more difficult for the Court. Because housing has been provided.[6] She is taking care of—There is a child that resides in her home. And she is taking care of a young grandchild.

*But the Court is satisfied as to the other circumstances with regard to K'Amora that would make it unacceptable to continue this parental relationship.* The inconsistences, it's everyone else's fault. I miss all my appointments because—I don't even know [why] they're missed. But they're missed.[7]

Children need stability. A 13 or 14-year-old may not need as much stability as a 21-month-old. *I don't know, but a 21-month-old surely needs stability. . . .*

*Upon consideration of all the testimony and a review of State's Exhibits . . . the Court finds by clear and convincing evidence*, having enumerated the factors in [the relevant statute] . . . *that it is in K'Amora's best interest to grant [DSS's] petition.*

---

[6] There was no issue about the adequacy of Mother's housing.

[7] The court also later found that DSS had made reasonable efforts to provide services of which Mother failed to take advantage, noting again that "the operative word in this case has been inconsistency on the part of the mother."

Mother appeals.

## II. DISCUSSION

The trial court remarked at the beginning of its ruling that "[i]t's almost as if the termination process began once [K'Amora] came out of the womb," and it is fair to say that Mother's refusal to allow K'Amora to receive antiviral medication started them down a path that culminated in the TPR Hearing and decision at issue. But that is not to say that the outcome was preordained. In addition to that first (and ill-considered) medical decision, the court relied on a nearly two-year (for K'Amora, life-long) pattern of erratic behavior, missed visits, and troubling mother-daughter interactions *and* on the positive environment in which K'Amora had lived her entire life with her foster family to support its findings, by clear and convincing evidence, that "the other circumstances . . . would make it unacceptable to continue this parental relationship" and that "it is in K'Amora's best interest to grant the Department's petition." The court opted *not* to analyze Mother's fitness to serve as K'Amora's parent, a question the court viewed as a closer one, but relied solely on the "exceptional circumstances" prong of Md. Code (1984, 2006 Repl. Vol.), § 5-323(b) of the Family Law Article ("FL"). In that way, then, this case is the analytical mirror image of our recent decision in *In re Jasmine D.*, ___ Md. App. ___, No. 1470, Sept. Term 2013 (filed June 30, 2014), an unfitness case in which we recognized that the plain language of FL § 5-323(b) authorizes a termination of parental rights to be premised on a finding *either* of unfitness or "exceptional circumstances."

14

Mother contends broadly on appeal that "the trial court err[ed] by terminating [her] parental rights." We examine that question against a three-tiered, interrelated standard of review:

> "[*First*, w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard . . . applies. [*Second*, i]f it appears that the [juvenile court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. *Finally*, when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [juvenile court's] decision should be disturbed only if there has been a clear abuse of discretion."

*In re Yve S.*, 373 Md. 551, 586 (2003) (quoting *Davis v. Davis*, 280 Md. 119, 126 (1997)). We review the circuit court's factual findings for clear error and its ultimate decision to terminate Mother's parental rights for abuse of discretion. *See id.*; *see also In re Shirley B.*, 419 Md. 1, 19 (2011) (holding that to warrant reversal, the trial court's decision must "be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable").

## A.    The Statutory Framework For TPR Proceedings.

When considering a petition to terminate parental rights, courts must balance the presumption that "a continuation of the parental relationship is in the child's best interests," *In re Jayden G.*, 433 Md. 50, 53 (2013), "against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect." *In re Rashawn H.*, 402 Md. 477, 497 (2007). Accordingly, the Family Law

15

Article authorizes courts to terminate parental rights without consent only under specific, narrow circumstances:

> *If*, after consideration of factors as required in this section, *a juvenile court finds by clear and convincing evidence* that a parent is unfit to remain in a parental relationship with the child *or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child* such that terminating the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

FL § 5-323(b) (emphasis added). A parent's right to raise her children "is not absolute," *In re Darjal C.*, 191 Md. App. 505, 530 (2010), but the "clear and convincing evidence" standard imposes a greater burden than the "mere preponderance" standard we use in custody determinations. *Rashawn H.*, 402 Md. at 499; *compare Karen P. v. Christopher J.B.*, 163 Md. App. 250, 266-67 (2005) (undertaking "exceptional circumstances" analysis in the context of a custody dispute). And this makes good sense, since a TPR determination is not merely a change in status, but represents the legal and total end to the parent's relationship with the child. *See Rashawn H.*, 402 Md. at 496 (termination of a parent's rights results in "a total rescission of the legal relationship between parent and child").

Beyond recognizing the presumption, though, a *parent's* rights do not drive our decision. As the Court of Appeals recently reaffirmed, "*the child's best interest* has always been the transcendent standard in . . . TPR proceedings," *In re Ta'Niya C.*, 417 Md. 90, 112 (2010) (emphasis added), and "trumps all other considerations," even the

16

rights and interests of parents. *Id.* at 111. To that end, FL § 5-323(d) lists the factors a juvenile court must consider in determining whether to grant non-consensual guardianship, again with the child's best interests guiding the inquiry:

> [I]n ruling on a petition for guardianship of a child, a juvenile court *shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests*, including:
>
> (1)(i) *all services offered to the parent* before the child's placement, whether offered by a local department, another agency, or a professional;
> (ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and
> (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;
>
> (2) the results of *the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home*, including:
> (i) *the extent to which the parent has maintained regular contact with:*
> *1. the child;*
> *2. the local department to which the child is committed; and*
> *3. if feasible, the child's caregiver;*
>
> * * *
>
> (iv) *whether additional services would be likely to bring about a lasting parental adjustment* so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is

17

in the child's best interests to extend the time for a specified period;

(3) *whether*:
(i) *the parent has abused or neglected the child or a minor* and the seriousness of the abuse or neglect;

\* \* \*

(v) *the parent has involuntarily lost parental rights to a sibling of the child*; and

(4)(i) *the child's emotional ties with and feelings toward the child's parents*, the child's siblings, and others who may affect the child's best interests significantly;
(ii) *the child's adjustment to:*
*1. community;*
*2. home;*
*3. placement; and*
*4. school*;
(iii) the child's feelings about severance of the parent-child relationship; and
(iv) the *likely impact of terminating parental rights on the child's well-being*.

FL § 5-323(d) (emphasis added).

## B.    "Exceptional Circumstances" And TPR Cases.

On its face, the disjunctive wording in § 5-323(b) ("a parent is unfit . . . *or . . .* exceptional circumstances" exist) authorizes the court to terminate a parent's rights even *absent* a specific finding that a parent is unfit to care for her child. *Jasmine D.*, slip op. at 19-20. Neither finding can be made in a conclusory fashion—the court must work through the statutory factors in detail (more on them shortly) and explain with particularity how the evidence satisfied them and how the court weighed them:

18

> *"The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and*, mindful of the presumption favoring a continuation of the parental relationship, *determine expressly whether those findings suffice* either to show an unfitness on the part of the parent to remain in a parental relationship with the child or *to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how.* If the court does that—articulates its conclusion as to the best interest of the child in that manner—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance."

*Ta'Niya C.*, 417 Md. at 110 (emphasis added) (quoting *Rashawn H.*, 402 Md. at 477).

But although the statute lists the factors the court must consider, it does not define "exceptional circumstances," and no published decision of this Court or the Court of Appeals has found exceptional circumstances in a TPR case independently of unfitness.[8] *In re Alonza D.*, 412 Md. 442 (2010), comes closest, but only by showing what will *not* satisfy the standard. There, the Court of Appeals reversed a termination order, holding that a father's failure to improve his circumstances over a long period of time could not, standing alone, justify termination based on exceptional circumstances. Although there

---

[8] In *In re Cross H.*, 200 Md. App. 142 (2011), *cert. dismissed*, 431 Md. 371 (2013), we affirmed the trial court's finding that the *father* was unfit and that exceptional circumstances existed to justify termination of the *mother*'s parental rights. Although the mother had a similar (lack of) relationship with the child there, we did not articulate what aspects of her history justified a finding of exceptional circumstances, as opposed to lack of fitness, or look at other cases examining extraordinary circumstances in the TPR context. *Id.* at 157-58; *compare, e.g.*, *Karen P.*, 163 Md. App. at 267 (analyzing "exceptional circumstances" in a contested custody proceeding between a biological mother and a non-biological father).

19

were factors that favored termination,[9] the trial court had before it no expert testimony regarding the "children's feelings and emotional ties" with their father, nor did it "articulate any finding that a continued parental relationship with [the father] would prove *detrimental* to their best interests." *Id.* at 460 (emphasis added). In short, the Court of Appeals held that the trial court had erred by basing its decision almost solely on the father's absence from his children's lives over time, even though the father had a full-time job and a home that could accommodate the children: "Passage of time, without explicit findings that the continued relationship with [the father] would prove detrimental to the best interests of the children, is not sufficient to constitute exceptional circumstances." *Id.* at 463 (footnote omitted).

The Court of Appeals has also directed trial courts to consider a parent's "behavior or character" in the exceptional circumstances analysis. *See In re Adoption/Guardianship No. A91-71A*, 334 Md. 538, 563 (1994) (examining "exceptional circumstances" in the context of a father's challenge to the adoption of his child by a third party and the attendant termination of his parental rights). The Court suggested in that case that exceptional circumstances *can* exist where a parent's behavior might not rise to the level of unfitness, but nonetheless contributes to a broader picture that could justify termination:

> *Behavior that may not be extreme enough to warrant a finding of unfitness is still relevant* to the ultimate finding of

---

[9] The children's father failed to complete parenting classes or abate lead in his residence despite a court order, the children were happy with a foster family who had cared for the children for the majority of their lives, and about four years had elapsed from the time Alonza and his brother were placed in foster care. *Alonza D.*, 412 Md. at 444.

20

> whether it is in the child's best interest to grant an adoption over the objection of the parent. Therefore, in making the best interest determination, *this evidence can, and should, be considered not only with regard to fitness, but as a potential factor which may give rise to exceptional circumstances* warranting the termination of parental rights.

*Id.* (emphasis added).

More recently, the Court of Appeals has emphasized the importance of stability and permanency for the child in the TPR analysis. In *In re Jayden G.*, 433 Md. 50 (2013), the trial court found *both* unfitness and exceptional circumstances and those factual findings went unchallenged on appeal. After noting that "[a] critical factor in determining what is in the best interest of a child is the desire for permanency in the child's life," *id.* at 82, the Court explained the difficult limbo a foster child inhabits:

> The status of a foster child, particularly *for* the foster child, is a strange one. He's part of no-man's land. . . . The child knows instinctively that there is nothing permanent about the setup, and he is, so to speak, on loan to the family he is residing with. If it doesn't work out, he can be swooped up and put in another home. It's pretty hard to ask a child or foster parent to make a large emotional commitment under these conditions.

*Id.* at 83-84 (quoting Joseph Goldstein, *Finding the Least Detrimental Alternative: The Problem for the Law of Child Placement, in* Parents of Children in Placement: Perspectives and Programs 188 n.9 (Paula A. Sinanoglu & Anthony N. Maluccio eds., 1981)); *see also* Joseph Goldstein, Anna Freud & Albert J. Solnit, *Beyond the Best Interests of the Child* 43 (New Edition with Epilogue, 1979) ("Therefore, to avoid irreparable psychological injury, placement, whenever in dispute, must be treated as the

21

emergency it is for the child."); *id*. at n.* ("Three months may not be a long time for an adult decisionmaker. For a young child it may be forever.").

Moreover, a parent's *actions* and *failures to act* both can bear on the presence of exceptional circumstances and the question of whether continuing the parent-child relationship serves the child's best interests. In *Jayden G.*, the trial court terminated parental rights after finding the mother to be unfit *and* finding exceptional circumstances. The mother claimed that the court had focused improperly on the positive care that Jayden had received from his foster family rather than her continued involvement in Jayden's life. *Id.* at 101. The Court of Appeals noted that Jayden's mother had failed to make *any* positive progress over the two-plus years that Jayden lived in foster care which, coupled with Jayden's healthy adjustment to living with a foster family, led the Court to conclude "that a severance of the relationship with the [m]other *would not have a detrimental effect on Jayden, but . . . would allow him to achieve permanency*." *Id.* at 102 (emphasis added); *see also Jasmine D.*, slip op. at 22. The facts in both *Jayden G.* and *Jasmine D.*, although they differ in the specific details, bear a striking structural resemblance to the circumstances before us.

### C. The Trial Court Properly Found Exceptional Circumstances That Justified Terminating Mother's Parental Rights.

This case presented an unusual fact pattern, at least among cases in which the court ultimately terminated the parent's rights. On the one hand, many of the family pathologies common to TPR cases were absent here. There was no allegation, for example, that Mother had affirmatively abused K'Amora, nor any real opportunity for

Mother to neglect her directly (she had gone straight from the hospital at birth to her foster home), nor any suggestion of substance abuse, nor an unstable housing situation. On the other hand, Mother had almost *no* actual involvement in K'Amora's life, had failed in troubling and well-documented (and undisputed) ways to parent her other three children safely, all of whom had been removed from her care (and although DSS later returned Sister to Mother's case, it did so reluctantly and only under highly unconventional circumstances that press the outer boundaries of the "least detrimental alternative" concept[10]). Mother had missed nearly half of her visits with K'Amora, and, in the view of the judge who experienced her testimony first-hand, seemed floridly in denial about the state of her mental health and her responsibility to follow through with visits, parenting classes, and therapy. (As the trial judge saw it, Mother believed that "[t]he inconsistencies [were] everyone else's fault.") So unlike *Alonza D.*, this is not a case in which the termination decision was grounded entirely in the passage of time as the child lived with a stable foster family.

The circuit court expressed some doubt about whether the evidence supported a finding by clear and convincing evidence that Mother is an unfit parent. But as in *Jayden G.*, a *failure* to parent can do as much damage as bad parenting. 433 Md. at 103 (noting that "continuing to hold on to this concept of a parental relationship any longer—in the

---

[10] *See* Goldstein, Freud & Solnit, *Beyond the Best Interests of the Child*, at 53 ("The least detrimental alternative, then, is that specific placement and procedure for placement which maximizes, in accord with the child's sense of time and on the basis of short-term predictions given the limitations of knowledge, his or her opportunity for being wanted and for maintaining on a continuous basis a relationship with at least one adult who is or will become his psychological parent.").

face of the Mother's persistent inability to take charge of her life—was contrary to Jayden's best interest"). And the court grounded its findings that exceptional circumstances were present and that K'Amora's best interests were served by terminating her parental relationship with Mother in a life-long series of failures and refusals on Mother's part:

- Mother's refusal to allow K'Amora to receive antiviral medication at birth;

- Mother's irrational and unfounded suspicions that hospital staff were attempting to kidnap K'Amora;

- Mother's repeated denial of any mental health problems, in spite of professionals' advice that she undergo treatment and take medication, her refusal to participate meaningfully in counseling, and her concomitant failure to abide by service agreements with DSS;

- Mother's sporadic and unproductive visitation with K'Amora, which averaged less than two hours a month, by our count, for the first twenty months of K'Amora's life, and with the result that she failed to establish a bond at all with K'Amora over that time;

- Social workers' specific concern that Mother could *not* "maintain K'Amora's well-being" if she were returned to Mother;

- Mother's failure to work for six years; and

- Mother's history of failing to parent or provide safe environments for K'Amora's older siblings.

Mother argues that the circumstances here are not extraordinary, but rather "quite ordinary," and that the court overreacted to Mother's hospital behavior and resistance to mental health care. She argues as well that Sister's return to Mother's home undercuts the court's decision to terminate her parental rights: "[M]other had a prior child protective services history involving [Sister], who was so bonded to her that she routinely ran from

24

foster care and returned home, leading [DSS] to eventually conclude that she would be safer at home than constantly running." Mother acknowledges, though, that Sister (fifteen years old at the time of the TPR Hearing) is not in school, and now has a child of her own. And Mother is not the only one for whom counseling has been recommended; although a judge told *Sister* she should go to counseling, Mother disagreed that she needed it, and did not encourage her to go, because "she's not mental."

We hold that the circuit court neither overreacted nor abused its discretion in terminating Mother's parental rights. The court faced the reality that sending K'Amora to live with Mother would have uprooted her from the safe and stable (and only) family environment she had known. The exceptional circumstances alternative is meant to cover situations, such as this, in which a child's transcendent best interests are not served by continuing a relationship with a parent who might not be clearly and convincingly unfit.[11] And the court performed precisely the sort of child-specific analysis that FL § 5-323(b) requires. Some of the stereotypical markers of unfitness may be absent from K'Amora's young life, but we see no abuse of discretion in the circuit court's decision not to send her to begin a life with a parent who refused her critical medical care, who has not been able or willing to secure medical care for herself, who has not participated consistently or effectively in visitation or programs designed to help the family, and with whom K'Amora has formed no emotional or psychological bonds—especially in the face of

---

[11] We express no views on whether the record would have supported a finding of unfitness had the circuit court decided to analyze the question.

25

K'Amora's safe and positive experience with the foster family that has cared for her since she left the hospital on Day Six.

Mother's current parental relationship with Sister and Sister's baby son neither obviated nor limited the court's obligation to consider K'Amora's "best interests" individually:

> *A court may reach different conclusions under FL Section 5-323(d) regarding different children of the same parent.* Indeed, as the facts of this case demonstrate, a parent may, for example, have regular and frequent contact with one child, but not the other, and have varying degrees of success in completion of different service agreements with respect to each child. Also, depending on the age at which the children of one parent were placed in foster care, the length of time they spent in foster care, and the frequency of contact with the natural parent, *one child may have maintained or formed an attachment to the natural parent, while the other child has not.*

*Ta'Niya C.*, 417 Md. at 116 (emphasis added); *see also In re Priscilla B.*, 214 Md. App. 600, 626 (2013) (pointing out that the "court need not wait for an injury to occur before finding neglect"). And we disagree with Mother's suggestion that the circuit court favored the foster family simply to improve K'Amora's economic circumstances. The court did not view K'Amora's best interests to lie with the foster family because of economics, nor should it. *See In re Priscilla B.*, 214 Md. App. at 604 ("[P]overty does not render parents unfit or children unsafe."). Instead, it contrasted Mother's lack of any parenting at all with a family who had, in the best sense of the term, fostered K'Amora's growth into a happy, healthy, well-adjusted child. We echo the sentiment Judge Harrell expressed in *Alonza D.*:

26

A child is entitled to whatever stability in a loving and supportive familial environment that society can muster when parents are unwilling to provide it. [Mother's] creation of the opportunity for such an environment to unfold as it has, allowing the vacuum to continue for eight years, but desiring to unsettle what has been established or leave its continuation in doubt, cannot be tolerated or allowed.

*Alonza D.*, 412 Md. at 469-70 (Harrell, J., dissenting).

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**