*In re: Adoption/Guardianship of H.W.*, No. 70, September Term, 2017, Opinion by Adkins, J.

**FAMILY LAW — TERMINATION OF PARENTAL RIGHTS — FAMILY LAW ARTICLE § 5-323 — EXCEPTIONAL CIRCUMSTANCES:** In assessing whether to terminate parental rights, a juvenile court must consider the statutory factors set forth in Md. Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article and make findings by clear and convincing evidence whether a parent is either unfit to remain in a parental relationship or exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating parental rights is in the child's best interests.

**FAMILY LAW — TERMINATION OF PARENTAL RIGHTS — EXCEPTIONAL CIRCUMSTANCES — CONSIDERATION OF NON-STATUTORY FACTORS:** A court must assess whether exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child according to the statutory factors set out in Md. Code (1984, 2012 Repl. Vol.), § 5-323(d). These factors are criteria for determining whether exceptional circumstances exist that rebut the presumption favoring a continued parental relationship. Consideration of any non-statutory factors must be tailored to the inquiry of whether the continued parental relationship is detrimental to the child's best interests. A juvenile court should closely adhere to the statutory factors.

**FAMILY LAW — TERMINATION OF PARENTAL RIGHTS — FAMILY LAW ARTICLE § 5-323 — FACTORS PERTAINING TO CUSTODY:** When terminating parental rights pursuant to Md. Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article, a juvenile court must base its assessment on the statutory factors set forth in § 5-323(d). Consideration of exclusively custodial factors risks according equal standing to third-party custodians, and a decision to justify terminating parental rights must focus on the continued parental relationship, not custody. In this termination of parental rights proceeding, the juvenile court's inclusion of the *Ross v. Hoffman*, 280 Md. 172 (1977), factors used in third-party custody disputes did not impermissibly taint its decision because it made specific findings under each required statutory factor and its *Ross* findings were substantively the same as the statutory findings.

Circuit Court for Baltimore City
Case No.: T15280012
Argued: April 6, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 70

September Term, 2017

IN RE: ADOPTION/GUARDIANSHIP OF H.W.

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.
Hotten, J., concurs and dissents.

Filed: July 16, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Proceedings to terminate parental rights necessitate maintaining a delicate balance between a parent's constitutional right to raise their children, the State's interest in protecting children, and the child's best interests.  Here, we return to the often-complicated question of exceptional circumstances in the context of terminating parental rights ("TPR") under Md. Code (1984, 2012 Repl. Vol.), § 5-323 of the Family Law Article ("FL").  We consider if, when assessing whether exceptional circumstances exist that make continuing the parental relationship detrimental to a child's best interests, a juvenile court errs by considering custody-specific factors used to determine exceptional circumstances in third-party custody disputes.  *See, e.g., Ross v. Hoffman*, 280 Md. 172 (1977).

**FACTS AND LEGAL PROCEEDINGS**

H.W. was born in April 2012 to S.B. ("Mother"), an 18-year-old former CINA[1] and M.W. ("Father").  Father had been convicted in Connecticut seven years earlier of sexual assault in the first degree and was released in 2009.  Four months before H.W. was born, Father was extradited from Maryland to Connecticut and incarcerated there.  Father was released in January 2013 and remained in Connecticut on probation.  He has never seen H.W.

---

[1] "CINA," as defined by Md. Code (1973, 2013 Repl. Vol., 2016 Supp.), § 3-801(g) of the Courts and Judicial Proceedings Article ("CJP") means a "child in need of assistance."  CJP 3-801(f) defines a child in need of assistance as:

> a child who requires court intervention because:
> (1) the child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
> (2) the child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

In October 2012, Mother left H.W. unattended during a bath. When she returned, she found him face down in the water. H.W. was hospitalized and on life support for two weeks. In December 2012, H.W. was found to be a CINA and was placed in Mother's care under an Order of Protective Supervision. Some months later, the Baltimore City Department of Social Services ("Department") sought emergency removal of H.W. from the home, which a juvenile court granted. In July 2013, H.W. was returned to Mother's care under another Order of Protective Supervision, which was rescinded in December 2013.

Mother gave birth to twins, H.J. ("Brother") and H.J. ("Sister")[2] in January 2014. In June 2014, Mother was bathing Brother in the kitchen sink under running water. Sister was in her car seat in a different room with a bottle. Sister began choking and Mother left Brother unattended to respond. When Mother returned to the kitchen, she discovered that Brother had suffered severe burns. He was hospitalized for nearly a month. The Department promptly filed Petitions with Requests for Shelter Care for all three children, which the juvenile court granted. H.W. and Sister were placed in a foster home belonging to Mr. and Mrs. M. on June 20, 2014. After being discharged from the hospital, Brother was placed in a separate foster home to address his specific medical needs, but he eventually joined H.W. and Sister at the M. home.[3] All three children were declared CINA.

---

[2] Because the twins have the same initials, we refer to them as "Sister" and "Brother" for convenience.

[3] Mother and the twins' father consented to adoption of the twins by the M. family and their parental rights have been terminated. At argument, the Department informed the Court that the M. family has adopted the twins.

At the time H.W. was removed, he had a healed burn on the side of his forehead. Mother told the Department caseworker that H.W. had run into a lit cigarette while playing. Mother reported that she contacted his pediatrician, who advised her to put Vaseline on the burn, but sought no other medical attention.

Lori Lee, H.W.'s caseworker, attempted to locate Father in July 2014 and received information that he was incarcerated in Kentucky. She sent a letter to him but received no response.[4] In late 2014, while on probation in Connecticut, Father learned that H.W. was in the State's custody, through either a summons or a letter from Lee. Father obtained permission to travel to Baltimore for a CINA hearing in December 2014. Mother introduced Lee to Father the morning of the hearing. Father had thought the hearing was in the morning and he wanted to visit H.W. When Lee explained that the hearing was scheduled for the afternoon, Father informed Lee that he would not be able to stay because he had to return to Connecticut. Lee told Father why H.W. was in the State's care, and that she would like for him to visit with H.W. Father indicated that he would speak with his probation officer, so he could return to Baltimore to visit with H.W. Father, however, did not immediately return to Connecticut. Instead, he left the courthouse with Mother and made alternate travel arrangements to leave the next day. He did not attend the December 2014 hearing.

In January 2015, Lee had a phone conversation with Father's probation officer while Father was present. Father wanted to attend an upcoming hearing and his probation officer indicated that she and Father would discuss whether or not he would receive permission to

---

[4] Other than information about Lee's efforts to locate Father, the record does not reflect that Father was ever incarcerated in Kentucky.

3

do so.  Later that month, Lee sent a letter to Father's probation officer providing additional information about the hearing.  She did not receive a response and Father did not attend the hearing.  Lee sent additional letters to Father in July and August, notifying him of upcoming hearings and enclosing copies of court orders.  She invited Father to contact her to "discuss any questions you may have regarding [H.W.] and [to] schedule visits."  Lee did not receive a response.  In August 2015, Father was incarcerated again for violating his probation.

Father wrote Lee a letter in October 2015, notifying her of his incarceration.  He identified an aunt and his brothers as relative resources for H.W.  He included contact information for his aunt and mother, but not for his brothers.  Father expressed that he wanted to be in H.W.'s life.  He claimed that his probation officer had refused to allow him to attend hearings in Maryland.  Father had "requested to be sentenced to prison in pursuit of no more probation, which will allow [him] to relocate back to Baltimore . . . ."

Father explained that he had difficulty communicating with Mother by phone but occasionally reached her through social media.  He stated that Mother became "stubborn and withdrawn when [he] asked of [H.W.]'s whereabouts."  Father also asked Lee for resources, "I don't know what you can do for [H.W.] and I, but I am sincerely asking for your help for our unity?"  Father anticipated being "incarcerated for approximately 2 y[ea]rs" but hoped that "you and your department have left me some options as [H.W.]'s father."  He asked Lee to send "any information about the progress that has been made with [H.W.]'s placement."

Lee investigated Father's aunt, who passed her fingerprint and background checks.  When Lee contacted the aunt about completing a home inspection, she declined to be a resource.  Rather, she was willing to be "a back-up plan to [the Department's] back-up

4

plan" and thought it best that H.W. remain with his foster family. Lee sent Father a letter in November 2015 notifying him of this development and informing him that his brothers had not contacted her regarding H.W.

Lee explained that H.W.'s foster family was willing and able to adopt him, and that H.W. was having behavioral issues. She also advised Father of an upcoming hearing in December and asked him to contact her if his situation changed, or if he had other relatives the Department could investigate. Between March and November 2016, Lee sent Father six more letters with copies of court orders concerning H.W. Father did not respond.

In October 2015, the Department filed a Petition for Guardianship with the Right to Consent to Adoption or Long Term Care Short of Adoption for H.W. Father and Mother objected, but later consented. Father, however, withdrew his consent and the matter proceeded to a contested hearing in 2017.

**The TPR Hearing**

Lee testified at the hearing, describing her meeting with Father in 2014, subsequent attempts at communication with him, and her investigation of Father's aunt. Lee acknowledged that Father had been under legal constraints since before H.W. went into care. During her testimony, she also described H.W.'s placement with the M. family and her monthly visits with the children. H.W. had some special needs relating to behavioral problems and had been diagnosed with ADHD. He was receiving treatment and the M. family worked with him through therapy. The M. family was in contact with Mother through phone and e-mail.

5

Lee testified that H.W. is emotionally attached to Mr. and Mrs. M., and calls them PopPop and Mommy. H.W.'s twin siblings are also placed with the M. family and H.W. has bonded with them—"truly a big brother." Lee stated that she had no concerns about H.W.'s care and opined that it would be detrimental to H.W. to remove him from the M. home because of his emotional attachments and because it would "set him backwards in his treatment, the therapy that he's been going through for his behavioral problems." Lee recommended that Mr. and Mrs. M. adopt H.W.

Father testified by phone from the Brooklyn Correctional Facility in Connecticut, where he was serving a 30-month sentence for violating his probation. During his testimony, Father explained that Mother did not contact him after he was extradited from Maryland in 2011. He had sporadic contact with Mother and, although he always asked to speak to H.W. during phone calls, this rarely happened. Mother did not share much information about H.W. with him, and on at least one occasion, they argued about money. Father explained that his probation officer had denied him permission to attend other hearings for H.W.

Father had several probation violations and had tested positive for marijuana. He explained that since he had been in Connecticut, "the majority of [his] situation has been homelessness," and that he had not been able to provide for himself. Father had been employed during his probation with a fast food restaurant and with a printing company. In early 2014 he sent money to his brother, who babysat H.W., for "Pampers, . . . for food, for a haircut, things like that."

Father's mandatory release date was in February 2018, but he anticipated release as early as November or December 2017 based on earned credits. Upon release, he would no

6

longer be subject to probation conditions. He testified that he enrolled in a program called "Good Intentions[,] Bad Choices" but that no other programs had been recommended to, or required of him. He had been referred to programs during his probation, including a drug treatment program, which he had not completed. Father did not think he needed counseling, explaining that he writes in his journal and has been doing his own reading to educate himself.

After release, Father planned to come to Baltimore and obtain custody of H.W. Although most of Father's family is in Baltimore, he did not have any resources identified in Baltimore—he was not in "re-entry stage" to "transition back into society" yet. He was unsure where he would live in Baltimore but hoped that family might help him. Father admitted that he had "no support at all." He was not sure how long he would stay in Baltimore, but if he did obtain custody of H.W., the maximum he would stay would be five years.

Father said he would keep H.W. in contact with the twins, and introduce H.W. to his teenage daughter, who lives in Philadelphia with her mother. Father explained that he was changing his life and did not want to give his son away to another family. He testified that he wanted to keep his parental rights because he wanted to be a "present" and "active" father.

### The Juvenile Court's Findings

The juvenile court considered Lee's and Father's testimony, as well as court orders, H.W.'s medical records, Lee's letters to Father, Father's letter to Lee, and a bonding evaluation between H.W. and the M. family.[5] Acknowledging the fundamental right of parents, the court also emphasized that the State has an interest in protecting vulnerable

---

[5] Mother did not appear for her bonding evaluation. The evaluation states that Father could not be evaluated because he was incarcerated.

children and that the juvenile court must give "primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests . . . ." The court then analyzed the statutory factors set forth in FL § 5-323(d),[6] as well as nine additional factors[7] to "determin[e] whether exceptional circumstances exist[ed]:"

1. Length of time child has been away from the biological parent[;]
2. Age of child when care was assumed by caretakers[;]
3. Possible emotional effect on child if custody changed to biological parent[;]
4. Possible emotional effect on child if custody is given to caretaker[;]
5. Period of time which elapsed before parent sought to reclaim child and efforts made toward reclamation[;]
6. Nature and strength of ties between child and current caretaker[;]
7. Intensity and genuineness of parent's desire to have the child[;]
8. Stability and certainty as to child's future in the custody of the parent[; and]
9. Stability and certainty as to child's future in custody of the caretaker.

Based upon the statutory factors in FL § 5-323(d), the juvenile court concluded that there was not clear and convincing evidence that Father was unfit. The juvenile court found "by clear and convincing evidence[,] based on the relevant statutory factors[,] that

---

[6] The juvenile court determined that Md. Code (1984, 2012 Repl. Vol.), § 5-323(c) of the Family Law Article ("FL") did not apply. We discuss the court's specific findings in greater detail, *infra*.

[7] The factors are substantially the same as those in *Ross v. Hoffman*, 280 Md. 172, 191 (1977), but the juvenile court did not identify the factors as such.

exceptional circumstances exist[ed] to make the continuation of the parental relationship detrimental to the best interests of the child." It awarded guardianship to the Department.

The Court of Special Appeals vacated the juvenile court's decision. *See In re Adoption/Guardianship of H.W.*, 234 Md. App. 237 (2017). It concluded that the juvenile court erred by using four factors related exclusively to custody of the child in deciding to terminate Father's parental rights. *Id.* at 251. Based on the differences between a proceeding to terminate parental rights and a custody proceeding, the Court of Special Appeals reasoned that factors relating solely to custody did not belong in a TPR analysis. *Id.*

We granted *certiorari* to resolve the following question:[8]

> 1. Are juvenile courts permitted to consider custody-specific factors in termination of parental rights proceedings, specifically: (a) the potential emotional effect of the change in custody; (b) the instability and uncertainty of the child's

---

[8] Petitioner presented the following questions, which we have consolidated and rephrased:

> 1. Did the Court of Special Appeals improperly proscribe juvenile courts from considering factors critical to the determination of a child's best interests when it held that, in determining whether to terminate parental rights, juvenile courts may not consider either the emotional effects of a change in custody upon the child or the stability and certainty of a child's future?
>
> 2. In determining that it is in five-year-old H.W.'s best interests to terminate the parental rights of an incarcerated father, whom the child has never met, did the juvenile court permissibly consider the following factors: (a) the potential emotional effect on the child of a change of custody; (b) the instability and uncertainty of the child's future in the custody of the father; and (c) the stability and certainty of the child's future in the custody of the prospective adoptive parents?

future in the parent's custody; and (c) the stability and certainty of the child's future in the custody of the prospective adoptive parents?

We shall conclude that, when terminating parental rights, a juvenile court must base its assessment on the statutory factors set forth in FL § 5-323. Consideration of exclusively custodial factors risks blurring important distinctions between parents and third-party custodians. In this case, the juvenile court's inclusion of custody-specific factors did not taint its decision because it made specific findings on each relevant statutory factor and its *Ross* findings were substantively the same as its more appropriate statutory findings.

## STANDARD OF REVIEW

We use three distinct, but interrelated standards to review a juvenile court's decision to terminate parental rights. *In re Adoption of Ta'Niya C.*, 417 Md. 90, 100 (2010). The juvenile court's factual findings are left undisturbed unless they are clearly erroneous. We review legal questions without deference, and if the lower court erred, further proceedings are ordinarily required unless the error is harmless. *Id.* The lower court's "ultimate conclusion," if it is "founded upon sound legal principles and based upon factual findings that are not clearly erroneous," will be "disturbed only if there has been a clear abuse of discretion." *Id.* (quoting *In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 297 (2005)) (brackets omitted).

## DISCUSSION

The Department and H.W. contend that the Court of Special Appeals committed legal error when it decided that use of the *Ross v. Hoffman*, 280 Md. 172, 191 (1977), factors relating to custody was impermissible in a TPR proceeding under FL § 5-323. They

10

assert that the statute does not create an exclusive list of factors to assess both exceptional circumstances and analyze a child's best interests. Because the ultimate standard is the child's best interests, they reason that a juvenile court should be free to assess any relevant factors, including custody. Further, they argue that FL § 5-323 specifically includes custodial factors relating to the child's placement.

Father concedes that a court may look beyond the statutory factors, but he maintains that the juvenile court must restrict its extra-statutory analysis to factors relevant to whether termination of parental rights is in the child's best interests. Father, relying on *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477 (2007), argues that because custody and TPR are separate inquiries, factors relevant to a custody analysis do not translate to the TPR context because parental success in TPR "merely preserves the *possibility* of future reunification . . . ." (Emphasis in original). Custody-specific considerations cloud the analysis, he reasons, because the question in a TPR proceeding is not whether the existing custodial arrangement is in the child's best interests, rather, it is whether continuing the parental relationship is detrimental to the child.

In *Ross*, 280 Md. at 179, we addressed whether exceptional circumstances were present in a custody dispute between a parent and a third party that merited granting custody to the third party. We identified several factors that we considered "of probative value in determining the existence of exceptional circumstances[,]" including:

> the length of time the child has been away from the biological parent, the age of the child when care was assumed by the third party, the possible emotional effect on the child of a change of custody, the period of time which elapsed before the parent sought to reclaim the child, the nature and strength of the ties

11

> between the child and the third party custodian, the intensity and genuineness of the parent's desire to have the child, [and] the stability and certainty as to the child's future in the custody of the parent.

*Id.* at 191.

The parties do not challenge the use of some of these factors in the proceeding below. Rather, their dispute centers on four factors: (1) the possible emotional effect on the child if custody was changed to the biological parent; (2) the possible emotional effect on the child if custody was given to the caretaker; (3) the stability and certainty as to the child's future in the custody of the parent; and (4) the stability and certainty of the child's future in the custody of the caretaker.

We look first to the fundamental principles associated with a court's decision to terminate parental rights and the statutory scheme set forth in FL § 5-323.

### The Transcendent Standard And FL § 5-323

This Court has long recognized that parents have a fundamental right to raise their children and make decisions about their custody and care. *See In re Adoption of Jayden G.*, 433 Md. 50, 66–67 (2013); *In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 298–99 (2005). As we explained in *Rashawn H.*, 402 Md. at 495, there is "a presumption of law and fact—that it is in the best interest of children to remain in the care and custody of their parents." These principles are not absolute—they are tempered by the State's interest in protecting children. *See Jayden G.*, 433 Md. at 68. The "transcendent" standard in TPR proceedings has always been the child's best interests. *Ta'Niya C.*, 417 Md. at 112; *Jayden G.*, 433 Md. at 67; *Rashawn H.*, 402 Md. at 496.

The General Assembly has established a legal framework to assess whether it is in a child's best interests to terminate parental rights that balances the child's best interests and the appropriate protection for parental rights. FL § 5-323(b) establishes the burden of proof and findings required for a juvenile court to terminate parental rights:

> If, after **consideration of factors as required in this section**, a juvenile court **finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interest of the child such that terminating the rights of the parent is in the child's best interests**, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

(Emphasis added). Subsection (d) requires that the juvenile court "shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests . . . ." and it provides a list of factors that must be considered.

### *Rashawn H.* And The TPR Analysis

We offered some guidance interpreting the TPR statute in *Rashawn H.*[9] The statutory scheme for terminating parental rights has "three critical elements in . . . balance that serve to give heightened protection to parental rights in the TPR context." 402 Md. at

---

[9] We considered both then-FL § 5-313 and its successor, FL § 5-323. *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 499 (2005).

13

498. First, although not "expressly articulated" in the statute,[10] there is an implicit presumption that "the interest of the child is best served by maintaining the parental relationship . . . ." *Id.* This presumption is rebuttable "only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* The parental relationship presumption originates from our precedent on parent-third party custody disputes, but the concepts of unfitness and exceptional circumstances have a **substantially different meaning in TPR cases**. *Id.*

In custody cases, unfitness "means an unfitness to have *custody* of the child, not an unfitness to remain the child's parent; exceptional circumstances are those that would make parental *custody* detrimental to the best interest of the child." *Id.* (emphasis in original). Facts that might demonstrate unfitness or exceptional circumstances in a custody case are not always sufficient to terminate parental rights. Therefore, to justify a TPR decision, "the focus must be on the continued parental relationship**, not custody**." *Id.* at 499 (emphasis added). The facts must show that the parent is unfit to continue the relationship, or exceptional circumstances make the continued relationship detrimental to the child's best interests. *Id.*

Second, the "State must overcome a much higher substantive burden by a higher standard of proof." *Id.* It must establish unfitness or exceptional circumstances by clear

---

[10] The General Assembly amended FL § 5-323(b) in 2009 to include this presumption. *See* 2009 Md. Laws, Ch. 350, § 1; *see also In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 710 n.8 (2011).

14

and convincing evidence rather than the preponderance standard applicable in custody cases. *Id.* Terminating parental rights is "a total rescission of the legal relationship between parent and child, and . . . is generally final." *Id.* at 496. Further, in custody disputes, the State serves as a neutral judicial forum, whereas in TPR proceedings, the State is "a moving party, acting in its capacity as *parens patriae*[,]" to terminate a parental relationship and transfer those rights to itself. *Id.*

Third, the Legislature has "carefully circumscribed the near-boundless discretion that courts have in ordinary custody cases to determine what is in the child's best interests." *Id.* at 499. The statutory factors are both considerations in determining whether TPR is in a child's best interests, and "**criteria for determining the kinds of exceptional circumstances that would suffice to rebut the presumption favoring a continued parental relationship and justify termination of that relationship**." *Id.* (emphasis added). *See also Ta'Niya C.*, 417 Md. at 104 ("[T]he same factors that a court uses to determine whether termination of parental rights is in the child's best interest under the TPR statute equally serve to determine whether exceptional circumstances exist."). The TPR statute "appropriately looks to . . . whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *Rashawn H.*, 402 Md. at 499–500.

Unfitness or exceptional circumstances do not, by themselves, mandate a decision to terminate parental rights. *See Jayden G.*, 433 Md. at 94. Rather, they demonstrate that the presumption favoring the parent has been overcome. The decision to terminate parental

rights must **always** revolve around the best interests of the child.[11]  *Id.*  The three concepts—unfitness, exceptional circumstances, and best interests—"are fused together, culminating in the ultimate conclusion of whether terminating parental rights is in a given child's best interests."  *Id.* at 96 n.32.

Judge Wilner clarified the appropriate balance between a parent's interest and the best interests of a child:

> The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how.  If the court does that— *articulates its conclusion as to the best interest of the child in that manner*—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

*Rashawn H.*, 402 Md. at 501 (emphasis in original).  This, we reiterated in *Ta'Niya C.*, 417 Md. at 111, "should be the touchstone for courts in TPR cases."

With this framework established, we next consider whether a juvenile court is permitted to deviate from the statutory framework by including other factors.

---

[11] If, however, the juvenile court does not find either exceptional circumstances or unfitness, the court may not re-examine best interests without keeping the constitutionally-based parental presumption firmly in mind.  *In re Adoption of Ta'Niya C.*, 417 Md. 90, 111 n.19 (2010).

## The Presence Of Additional Factors

FL § 5-323(d) requires the juvenile court to "give primary consideration to the health and safety of the child and consideration to **all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including** . . . ." (Emphasis added). Thus, although the statute limits the juvenile court's discretion and sets forth criteria a juvenile court **must** consider in making the exceptional circumstances and best interests analyses, the statutory language does not contemplate that those factors are exclusive. *See Rashawn H.*, 402 Md. at 499.

Additional criteria may come into play in the exceptional circumstances analysis. For example, in *Ta'Niya C.*, 417 Md. at 104 n.11, we explained that in a TPR exceptional circumstances analysis, "[i]n addition to . . . statutory factors, courts may consider 'such parental characteristics as age, stability, and the capacity and interest of a parent to provide for the emotional, social, moral, material, and educational needs of the child.'" (quoting *Pastore v. Sharp*, 81 Md. App. 314, 320 (1989), *cert. denied*, *Pastore v. Sharp*, 419 Md. 304 (1990)). These additional factors are germane to statutory criteria, such as a parent's efforts to alter circumstances to make it in the child's best interests to return to the parent's home. *See* FL § 5-323(d)(2); *see also id.* (d)(2)(ii) (parent's contributions to child's care). They also directly relate to the statutory inquiry regarding a parent's unfitness or the presence of exceptional circumstances that make continuing the relationship detrimental to the child's best interests. *See Rashawn H.*, 402 Md. at 499.

H.W. asserts that this Court applied the *Ross* factors in *Ta'Niya C.* In that case, we analyzed language from *Rashawn H.* that was directly traceable to *Ross*. *Ta'Niya C.*, 417

17

Md. at 106. Our discussion of *Ross* was intended to clarify the relationship between the presumption accorded to parents and the paramount standard in TPR proceedings—the child's best interests. *Id.* at 105. We did not apply the *Ross* factors or endorse application of those factors in our decision to remand the case to the juvenile court for an appropriate assessment of whether exceptional circumstances existed. *Id.* at 116–17.

*In re Adoption of K'Amora K.*, 218 Md. App. 287, 305–06 (2014), similarly does not demonstrate that the *Ross* factors are utilized to assess exceptional circumstances in TPR proceedings under FL § 5-323. There, the Court of Special Appeals explained that this Court had included a parent's behavior or character in the exceptional circumstances analysis in another case, *In re Adoption/Guardianship No. A91-71A*, 334 Md. 538 (1994). *K'Amora K.*, 218 Md. App. at 306. But the Court of Special Appeals drew from a portion of *No. A91-71A* that discussed factors **other than** those set forth in *Ross*. *Id.* (citing *No. A91-71A*, 334 Md. at 562–63). Specifically: the effect upon the child's stability of having the particular relationships continue; abandonment by a parent; and a failure to support or visit the child. These behaviors provided "insight into the parent's character, motivation, or ability to fulfill parental responsibilities."[12] *No. A91–71A*, 334 Md. at 563. These factors do not address custody—rather they reflect on the nature of the parent-child relationship that a TPR proceeding would sever.

---

[12] These factors are already encompassed in the statute. *See, e.g.*, FL § 5-323(d)(2)(i) (parent's efforts to maintain regular contact with child); *id.* (d)(2)(ii) (parent's contribution to child's care and support); *id.* (d)(4)(iii)–(iv) (child's feeling about TPR and impact of terminating parental rights on child's wellbeing).

The Department and H.W. maintain that the Court of Special Appeals' decision directly conflicts with *In re Adoption/Guardianship of C.A. and D.A.*, 234 Md. App. 30 (2017), because the Court approved "use of the *Ross* factors in a guardianship action." In *C.A. and D.A.*, after explaining that the factors in FL § 5-323 serve as mandatory criteria to determine exceptional circumstances that would rebut the parental presumption, the intermediate appellate court identified "[o]ther criteria relevant to an exceptional circumstances determination," specifically:

> the length of time that the child has been with his adoptive parents; the strength of the bond between the child and the adoptive parent; the relative stability of the child's future with the parent; the age of the child at placement; the emotional effect of the adoption on the child; the effect on the child's stability of maintaining the parental relationship; whether the parent abandoned or failed to support or visit with the child; and, the behavior and character of the parent, including the parent's stability with regard to employment, housing, and compliance with the law.

*Id.* at 50 (citing *No. A91–71A*, 334 Md. at 562–64). These factors, drawn from *No. A91–71A*, are **modified** from independent adoption cases relying on *Ross*.[13] *Compare id.*, *and No. A91-71A*, 334 Md. at 562–64, *with Ross*, 280 Md. at 191. Notably, the Court of Special

---

[13] The *Ross* factors have surfaced in independent adoption cases under FL § 5-3B-22, which authorizes courts to grant adoption without a natural parent's consent under certain circumstances. *See In re Adoption/Guardianship No. 3598*, 347 Md. 295, 325–26 (1997); *In re Adoption/Guardianship No. A91-71A*, 334 Md. 538, 561–62 (1994). In both cases, the prospective adoptive parents had taken custody of the child and the natural parent sought the child's return. *See No. 3598*, 347 Md. at 327; *No. A91-71A*, 334 Md. at 545. FL § 5-3B-22(b) specifically requires that the prospective adoptive parent have had custody of the child for a specific period of time. Finally, the dispute, between two private parties, bears greater resemblance to third-party custody cases in which the State serves as a neutral forum, rather than an active participant.

Appeals did **not** include the custody-specific factors from *Ross* that triggered the controversy in this case.[14]

### The *Ross* Factors And The TPR Statute

The Department and H.W. contend that the *Ross* factors pertaining to custody are effectively encompassed in FL § 5-323. A child's home life is part of the TPR analysis, which, they assert, necessarily includes custody. They reason that because the guardianship statute gives juvenile courts discretion in making decisions concerning the child's best interests, custody-specific factors are entirely appropriate elements to include in the FL § 5-323 calculation.

The Court of Special Appeals determined that some *Ross* factors were consistent with statutory factors, particularly those set forth in FL § 5-323(d)(4), and relevant to the central question of whether the continued parental relationship would be detrimental to a child's best interest. *H.W.*, 234 Md. App. at 251. But, it cautioned, factors that "expressly pertain to custody—the possible emotional effect on the child of a change in custody and the stability and certainty as to the child's future in the custody of the parent—do not belong in a TPR analysis." *Id.*

---

[14] The Court of Special Appeals included a factor considering the "emotional effect of the adoption on the child." *In re Adoption/Guardianship of C.A. and D.A.*, 234 Md. App. 30, 50 (2017). We consider that proper framing of this factor is set forth in FL § 5-323(d)(4), specifically, the child's emotional ties to individuals who significantly affect his or her best interest, the child's feelings about ending the parent-child relationship, and the impact of terminating parental rights on the child's well-being. Adoption may follow a TPR decision, but the court assessing whether to terminate parental rights must focus on whether the parent is unfit to have a continued relationship with the child, or that exceptional circumstances make continuing the relationship detrimental to the child's best interests, and whether TPR is in the child's best interests. *Rashawn H.*, 402 Md. at 499.

20

We agree with the Court of Special Appeals that some *Ross* factors demonstrate reasonable overlap with certain statutory factors in FL § 5-323(d).  The chart below illustrates the overlap:

| *Ross* Factors | FL § 5-323(d) |
|---|---|
| Length of time the child has been away from the biological parent. | FL § 5-323(d)(2)(iv) (additional services bring about parental adjustment to return child in ascertainable time not greater than 18 months from date of placement unless it in child's best interests to extend the time).  FL § 5-323(d)(4)(i) (child's emotional ties with and feelings towards parents, siblings, others who may affect child's best interests significantly).  FL § 5-323(d)(4)(iii)–(iv) (child's feelings about severing parent-child relationship and likely impact of TPR on child's well-being). |
| Age of child when care assumed by third party. | FL § 5-323(d)(2)(iv) (see *supra*).  FL § 5-323(d)(4)(ii) (child's adjustment to community, home, placement).  FL § 5-323(d)(4)(iii)–(iv) (see *supra*). |
| The period of time elapsed before the parent sought to reclaim the child. | FL § 5-323(d)(2) (results of parent's effort to adjust parent's circumstances, condition, or conduct to make it in child's best interests to be returned to parent's home).  FL § 5-323(d)(2)(i) (extent to which parent has maintained regular contact with child). |
| The nature and strength of the ties between the child and the third-party custodian. | FL § 5-323(d)(4)(i) (see *supra*).  FL § 5-323(d)(4)(ii) (see *supra*). |
| The intensity and genuineness of the parent's desire to have the child. | FL § 5-323(d)(2) (see *supra*).  FL § 5-323(d)(4)(i), (iii)–(iv) (see *supra*).  *Ta'Niya C.*, 417 Md. at 104 n.11. |

The custody-specific factors—the possible emotional effect on the child of a change of custody and the stability and certainty as to the child's future in the custody of the

parent—present different considerations.[15] To be sure, FL § 5-323(d) requires the juvenile court to consider "**all other factors** needed to determine whether terminating a parent's rights is in the child's best interests . . . ." before supplying a list of considerations that must be included. (Emphasis added). And we observe that trial courts are accorded significant discretion in making assessments about a child's best interest. *See In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 713 (2011). Although the custody-specific *Ross* factors relate to certain statutory factors, the relationship alone does not resolve this case. We assess these factors, and whether they pose impermissible considerations that may lead a juvenile court's TPR analysis astray.

The child's emotional attachments and the potential emotional effect on the child from a change of custody falls well within the explicit statutory factors a court must address in assessing the child's placement. *See* FL § 5-323(d)(4)(i) (consider "child's emotional ties with and feelings toward . . . others who may affect child's best interests significantly"); *id.* (d)(4)(ii) (child's adjustment to community, home, placement, and school). And, as in this case, that placement may be a foster family who wishes to adopt the child. *See, e.g.*, *Jayden G.*, 433 Md. at 91; *Amber R.*, 417 Md. at 707; *Ta'Niya C.*, 417 Md. at 95–96.

The stability and certainty as to the child's future in the custody of the parent relates to statutory factors considering whether the parent "is, or within a reasonable time will be,

---

[15] At oral argument, we sought clarification on whether the juvenile court independently added the *Ross* factors to the analysis. A review of the record reveals that the Department relied on the *Ross* factors during its closing argument and specifically discussed custodial considerations.

able to care for the child in a way that does not endanger the child's welfare." *Rashawn H.*, 402 Md. at 500; *see also* FL § 5-323(d)(2) (parent's efforts to adjust circumstances to make it in child's best interests for child to be returned to parent's home); *id.* (d)(2)(iv) (whether additional services could bring about "lasting parental adjustment" to return child to parent in ascertainable time). These factors are connected—albeit loosely—to the best interests analysis FL § 5-323 requires.

On the other hand, we have cautioned that:

> a child's prospects for adoption must be a consideration independent from the termination of parental rights . . . in that "the facts should first be considered as if the State were taking the child from the parent for some indefinite placement and upon that determination open the question of the suitability of the proposed adoption and its relation to the child's welfare."

*Victor A.*, 386 Md. at 317 (quoting *Cecil Cty. Dep't of Soc. Servs. v. Goodyear*, 263 Md. 611, 615 (1971)). This Court has consistently emphasized that custody proceedings are "on a different plane than TPR proceedings." *Rashawn H.*, 402 Md. at 495–96; *see also Burak v. Burak*, 455 Md. 564, 631–32 (2017) (declining to adopt FL § 5-323(d) criteria as standard for unfitness in third-party custody dispute). *Rashawn H.*, teaches us that the statute cabins the "near-boundless discretion" that courts have in custody cases. 402 Md. at 499. FL § 5-323 balances a court's inquiry into whether the continued parental relationship is in the child's best interests with the appropriate consideration owed to a parent's fundamental rights. *Id.* Courts must address the presumption accorded to parents, "[r]ather than deciding at the outset what living arrangement is in the child's best

23

interests . . . ." *Jayden G.*, 433 Md. at 95. To do otherwise risks "creat[ing] the impression that the natural parents and a third party stood on the same footing." *Id.*

Our decision in this case turns on harmonizing these competing considerations. We are mindful that the best interests of a child require flexibility based on the circumstances unique to each child. *Id.* at 86. We must decide whether, in this case, the juvenile court's inclusion of custody-specific factors unduly tipped the balance between a parent's rights, the State's interest in protecting vulnerable children, and the child's best interests.

### The Juvenile Court's Findings

The juvenile court first considered "all services offered to the parent before the child's placement, whether offered by a local department, another agency or a professional[,]" FL § 5-323(d)(1)(i), and the "extent, nature, and timeliness of services offered by a local department to facilitate reunions of the child and parent . . . ." *Id.* (d)(1)(ii). Father's whereabouts were unknown when H.W. came into care in 2014 and "no services could be provided prior to the child's placement." Lee had communicated with Father and explored the resources he offered when he asked for assistance in his October 2015 letter. Lee and Father had not discussed service agreements. Father's incarceration made it difficult to offer reunification services, and Father did not testify that he had "availed himself of any services or programs while incarcerated." Because there were no service agreements, the juvenile court was unable to make findings under subsection (d)(1)(iii), regarding the extent to which the Department and Father had fulfilled obligations under any service agreements.

Turning to subsection (d)(2), which assesses "the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home," the juvenile court considered Father's efforts to maintain regular contact with H.W., the Department, and the M. family. *See id.* (d)(2)(i). Father has never met H.W. Although Father asked to visit his son when he was at the December 2014 hearing and presumably was available because he stayed an extra day, he chose not to see H.W. Father had "limited contact" with the Department and there is no evidence that he had contact with the M. family. The juvenile court also found under subsection (d)(2)(ii) that Father had not provided support to H.W.

In considering Father's incarceration, the juvenile court observed that TPR proceedings involving an incarcerated parent turn on the specific facts of each case. The court considered precedent demonstrating that lengthier sentences of incarceration may weigh in favor of terminating parental rights, but the ultimate consideration was the best interests of the child. Under subsection (d)(2)(iii), Father's incarceration was not a parental disability, but it impacted H.W.'s wellbeing. Father had been incarcerated or under supervision throughout H.W.'s life, and he would be incarcerated for approximately another year. Although this was "short term" incarceration, the court found that Father's incarceration and lack of contact did not serve H.W.'s best interests.

Subsection (d)(2)(iv) requires considering whether additional services are likely to bring about an adjustment "so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement[.]" A juvenile court may extend that period for an identifiable time upon a specific finding that it is in the child's

best interests to do so. *Id.* The juvenile court found that H.W. had been in the Department's care for almost three years, and Father had been incarcerated, or out of state, and had only minimal contact with the Department. Although Father planned to return to Baltimore and attempt reunification, he would be incarcerated for another year and had no concrete plans or resources available upon his release. The court concluded that it would not be in H.W.'s best interests to leave the case open for an additional year in the hope that Father would come to Baltimore to reunify with H.W. "The Court can point to no behavior or pattern of the father that would persuade the Court to believe that additional time . . . [or] additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent."

The juvenile court determined that subsections (d)(3)(ii)–(v)[16] did not apply, but concluded that under (d)(3)(i), which considers whether "the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect," Father had "responsibility for the supervision of the child[,]" and his "inability through his actions that have resulted in incarceration ha[ve] resulted in [n]eglect by omission."

FL § 5-323(d)(4)(i) requires the juvenile court to assess "the child's emotional ties with and feelings towards the child's parents, the child's siblings, and others who may affect the child's best interests significantly." The court referred to the bonding study with

---

[16] These subsections address: (1) results of drug tests at birth for a child; (2) whether the parent has subjected the child to torture, abuse, sexual abuse, or chronic and life-threatening neglect; (3) a parent's convictions for crimes of violence against his or her offspring or another parent of the child; and (4) whether a parent has involuntarily lost parental rights to a sibling of the child. *See* FL § 5-323(d)(3)(ii)–(v).

26

the M. family and observed that H.W. has bonded with his siblings. Although Father said he would keep H.W. in touch with the twins, Father expressed an intention to take H.W. away from Baltimore, which would separate him from his siblings.

Subsection (d)(4)(ii) examines the child's adjustment to the community, home, placement, and school. The juvenile court cited Lee's testimony about H.W.'s current placement and his attachment to the M. family. Subsections (d)(4)(iii) and (iv) look to the effect terminating parental rights would have on the child. In considering H.W.'s feelings about the severance of the parent-child relationship under subsection (d)(4)(iii), the court found that H.W., who was four at the time of the hearing, had never met Father and did not know that Father existed. Applying (d)(4)(iv), the hearing judge concluded that terminating parental rights would impact H.W.'s well-being by permitting him to be "adopted with [his] siblings by [his] current caregiver . . . ." who had cared for him "for the majority of his 4 years of life."

The juvenile court then considered nine additional factors, which it identified as "[f]actors for determining whether exceptional circumstances existed." The juvenile court's finding under the first factor, the "[l]ength of time [the] child has been away from the biological parent," was identical with its finding under subsection (d)(2)(i)—that H.W. has never been in Father's care and Father has never seen H.W. Under the second factor, the "[a]ge of [the] child when care was assumed by [the] caretakers," the court found that H.W. had been placed with the M. family since June 20, 2014.

The third factor the court applied was the "[p]ossible emotional effect on [the] child if custody changed to the biological parent." It found that "[a]ny change that would remove

27

the child from a home that he has only known would more than likely have a detrimental effect" and that H.W. "does not know his father . . . ." Here, the court was repeating assessments it had already made in analyzing the factors in subsections (d)(4)(ii) and (iii).

With regard to the fourth factor, the "[p]ossible emotional effect on [the] child if custody is given to the caretaker[,]" the court concluded:

> [H.W.] has been in the care of the current caretakers not to[o] long after his birth. . . . [H.W.] is in the unique position of being placed with his two other siblings in a home that has been characterized as loving. . . . [He] is bonded to the only parents he has known since birth. Remaining with the current caretakers would continue the positive emotional effect on . . . [H.W.].

The length of H.W.'s placement with the M. family, the positive nature of his placement and emotional attachment to the M family, and his relationship to his siblings had already been addressed in the court's earlier findings under subsection (d)(4)(ii).

The fifth and seventh factors, the time elapsed before Father sought to reclaim H.W., his efforts towards reclamation, as well as the "intensity and genuineness" of his desire to have H.W., necessitated examination of facts and circumstances related to Father's efforts under (d)(1)–(2). The juvenile court found that Father "has stated in a letter and in testimony a desire to have the child but has done nothing further to promote that agenda. Father has shown no genuineness or intensity to have his child." Here too, the juvenile court's analysis and findings were consistent with its existing statutory findings. In considering the sixth factor, the "nature and strength of the ties between [the] child and current caretaker," the juvenile court repeated its findings from Lee's testimony about her

28

recent visit to the M. family, which it had already set forth under findings for subsection (d)(4)(ii).

Regarding factor eight, the stability and certainty as to H.W.'s future in Father's custody, the juvenile court reiterated its findings under subsections (d)(1)(i)–(ii), regarding Father's incarceration, and that he had not sought any services or programs while incarcerated. The hearing judge also found that Father could be released in a year and intended to come to Baltimore, but he "does not have any resources in place to provide stability for himself[,] let alone a child." Further,

> [t]he father's family in Baltimore is not a resource for him, let alone a child. . . . Father did not, while on parole, seek any stability. Father could not successfully complete the terms of his probation, which resulted in his current incarceration. . . . [H.W.'s] stability and certainty . . . in [F]ather's care would be one of instability and uncertainty . . . .

The juvenile court had already made these findings under subsection (d)(2)(iv), when it considered whether additional services could bring about a lasting parental adjustment to permit H.W. to return to Father's care. The juvenile court's specific conclusion regarding Father's stability, although not identical to other findings, was consistent with the court's earlier determination that Father had not demonstrated any "behavior or pattern" that persuaded the court that "additional services would be likely to bring about a lasting parental adjustment" such that he could safely and appropriately care for H.W. within the statutory timeframe.

Finally, in considering the ninth factor, the stability and certainty as to H.W.'s future in the custody of the M. family, the juvenile court determined only that "[H.W.] has gained

stability and certainty in the care and custody of the current caretaker and has thrived and progressed under their care." This conclusion recycled the juvenile court's previous statutory findings regarding H.W.'s placement.

**Analysis**

As we have explained *supra*, the focus of the inquiry in a TPR proceeding revolves around whether the **continued parental relationship** is detrimental to the child's best interest. *See Rashawn H.*, 402 Md. at 499. The juvenile court thoroughly considered the relevant statutory factors in relation to the available evidence and made detailed findings while keeping the presumption of the continued parental relationship in mind. *See id.* at 501.

An exceptional circumstances analysis must turn on whether the presence—or absence—of particular facts and circumstances makes continuation of the parental relationship detrimental to the child's best interests. *See, e.g.*, *In re Adoption/Guardianship of Alonza D., Jr.*, 412 Md. 442, 462–63 (2010) ("Passage of time, without explicit findings that the continued relationship with [the parent] would prove detrimental to the best interests of the children, is not sufficient to constitute exceptional circumstances."). Consideration of **any** non-statutory factors in a TPR proceeding must be tailored to that inquiry. Custodial decisions necessitate different considerations than the decision to terminate parental rights. *Rashawn H.*, 402 Md. at 498–99. Using purely custodial *Ross* factors runs the risk of ignoring the essential assessment of the **parental** relationship that is necessary to decide whether to terminate that relationship. Drawing comparisons between a parent and a third party in TPR proceedings may risk according the third party equal footing, particularly if the juvenile court fails to make findings in accordance with

30

the statute. Although some *Ross* factors are related to the statutory factors, it is undoubtedly the best practice for juvenile courts to adhere to FL § 5-323(d). *See id.* at 501; *see also Ta'Niya C.*, 417 Md. at 104 & n.11.

As we explained earlier, the final decision of a juvenile court is subject to review for abuse of discretion. *Ta'Niya C.*, 417 Md. at 100. Although by incorporating these factors the juvenile court came perilously close—indeed, we consider this **as far as a juvenile court can go**—it did not cross the line. The juvenile court did not make **separate** findings based on the *Ross* factors. Rather, the bulk of the court's conclusions repeated its findings properly made under the statutory factors. We conclude that, under these circumstances, injecting the *Ross* factors did not upset the legislatively crafted balance set out in FL § 5-323.

Father asserts that the trial court "impermissibly contrasted H.W.'s respective futures with [Father] and his foster parents[,]" by considering these custodial factors. He also maintains that the juvenile court failed to properly consider whether he would be capable of caring for H.W. within a reasonable amount of time. The TPR statute explicitly requires the court to consider factors associated with the child's placement, *see* FL § 5-323(d)(4), and the parent's efforts to adjust their circumstances to be reunited with the child. *See id.* (d)(1)–(2). We have directed courts to proceed with caution in assessing the factors relating to a child's foster care placement, and not to rely on bonding with a foster family as the primary justification for terminating parental rights.

In *Alonza D.*, 412 Md. at 464, we observed that it was reasonable to presume that a "successful foster care placement has at its foundation a level of bonding by the children

31

with the caretaker." Bonding alone cannot be a dispositive factor—the juvenile court must assess whether the continued relationship with a biological parent is detrimental to the child's best interests. *Id.* Otherwise, we reasoned, "reunification with a parent would be a mere chimera . . . ." *Id.*

Although H.W. had thrived in his foster care placement, that is not enough reason to sever Father's parental rights. "For exceptional circumstances to exist, the court must also find that the passage of time when the parent and the child were apart makes continuation of the parental relationship detrimental to the best interest of the child." *Ta'Niya C.*, 417 Md. at 112. Here, the juvenile court properly looked to Father's conduct. H.W. did not have any ties to Father. He was unaware that Father existed. The evidence demonstrated that Father had been relatively indifferent to his obligations to his child. Father did not know that H.W. was in the Department's custody for a prolonged period of time. He had only minimal contact with the Department regarding reunification and visitation. When Father had the opportunity to visit with H.W., he chose not to do so. From this, the juvenile court reasonably concluded that continuing the legal relationship in the hope that Father might make changes in his life to permit reunification was unlikely based on Father's past behavior, and it was not in H.W.'s best interests to do so.

Father's incarceration made it difficult for the Department to offer reunification services. As we explained in *Rashawn H.*, 402 Md. at 500, the Department must offer a reasonable level of services to assist in reunification. *See also* FL § 5-525(e) (requiring reasonable efforts to make it possible for a child to return to the child's home). These efforts need not be perfect, *In re James G.*, 178 Md. App. 543, 601 (2008), but are judged

on a case-by-case basis. *In re Shirley B.*, 419 Md. 1, 25 (2011). Here, Father had only sporadic contact with the Department, rendering this task even more difficult. In short, there was no evidence that Father could, "or within a reasonable time w[ould] be, able to care for the child in a way that does not endanger the child's welfare." *Rashawn H.*, 402 Md. at 500.

## CONCLUSION

The juvenile court gave "most careful consideration to the relevant statutory factors," and made specific findings based on the available evidence. *Id.* at 501. Although factors pertaining exclusively to custody have no place in TPR assessments under FL § 5-323, the juvenile court did not abuse its discretion when, based on these circumstances and an appropriate statutory analysis, it terminated Father's parental rights.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT M.W.**

Circuit Court for Baltimore City
Case No. T15280012
Argued: April 6, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 70

September Term, 2017

_____

IN RE: ADOPTION/GUARDIANSHIP
OF H.W.

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Concurring and Dissenting Opinion by
Hotten, J.

_____

Filed: July 16, 2018

Respectfully, I must concur in part, and dissent in part with the Majority's holding. Using the four factors related exclusively to a custody determination is not appropriate in deciding whether to terminate the parental rights of H.W.'s father, M.W. ("Father"). I agree with the Majority's rationale that "[c]onsideration of exclusively custodial factors risks blurring important distinctions between parents and third-party custodians." Majority Slip Op. at 10. However, in acknowledging that an analysis of custody factors blurs important distinctions, I do not know whether the injection of custody factors tainted the juvenile court's decision. I agree with the Court of Special Appeals that consideration of custody factors was reversible error.

At issue are the factors that a court must adhere to in rendering its findings in a TPR proceeding. Maryland Code (1984, 2012 Repl. Vol.), § 5-323(b) of the Family Law Article ("Fam. Law") allows for the termination of parental rights if "a juvenile court finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests[.]" The two threshold considerations are parental unfitness or exceptional circumstances. However, when a court exercises its discretion to terminate parental rights, the most critical overarching determination is the child's best interest. *In re Adoption of Jayden G.*, 433 Md. 50, 82, 70 A.3d 276, 295 (2013).

Fam. Law § 5-323(d)(1) expressly provides the factors to be considered, including:

(1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;

(ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's effort to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;

2. the local department to which the child is committed; and

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii) 1. A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or

B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in § 5-1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse;

2. chronic and life-threatening neglect;

3. sexual abuse; or

4. torture;

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence against:

A. a minor offspring of the parent;

B. the child; or

2

C. another parent of the child; or
2. aiding or abetting, conspiring, or soliciting to commit a crime described in item 1 of this item; and
(v) the parent has involuntarily lost parental rights to a sibling of the child;  and
(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;
(ii) the child's adjustment to:
1. community;
2. home;
3. placement; and
4. school;
(iii) the child's feelings about severance of the parent-child relationship; and
(iv) the likely impact of terminating parental rights on the child's well-being.

As both the Majority and the Court of Special Appeals have alluded to, Fam. Law § 5-323(d) does not confine the court's analysis to the factors specifically enumerated.  The express text of the statute allows a court to give due "consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests[.]" Fam. Law § 5-323(d).

In the case at bar, after considering each of the relevant statutory factors in Fam. Law § 5-323(d), the juvenile court could not find clear and convincing evidence of Father's unfitness to remain in a parental relationship with H.W.  Consequently, the juvenile court examined whether the Department had shown by clear and convincing evidence, exceptional circumstances that rendered a continuation of the parental relationship detrimental to the best interest of the child.  In order to determine whether exceptional circumstances existed, the juvenile court relied on four custody-specific factors which are not expressly stated in § 5-323(d) and which we have addressed within the context of a

3

child custody action. Those factors were: (1) the possible emotional effect on the child if custody changed to biological parent; (2) the possible emotional effect on the child if custody is given to a caretaker; (2) the stability and certainty as to the child's future in the custody of the parent; and (3) the stability and certainty as to the child's future in the custody of the caretaker. *See Burak v. Burak*, 455 Md. 564, 659, 168 A.3d 883, 938–39 (2017) (citing *Ross v. Hoffman*, 280 Md. 172, 191, 372 A.2d 582, 593 (1977)). After considering these factors, the juvenile court determined that exceptional circumstances existed to terminate Father's parental rights.

This Court has continually grappled with balancing a child's best interest and finding parental unfitness or exceptional circumstances. Writing for this Court, Judge Wilner first endeavored to interpret the factors considered in a TPR proceedings in *In re Adoption/Guardianship of Rashawn H.* ("*Rashawn H.*"), 402 Md. 477, 937 A.2d 177 (2007). *Rashawn H.* may not have provided as clear guidance as the Majority suggests. As explained by the Majority, *Rashawn H.* struck a balance between a parent's and child's interest:

> The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, mindful of the presumption favoring a continuation of the parental relationship, determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how. If the court does that—*articulates its conclusion as to the best interest of the child in that manner*—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

4

*Id.* at 501, 937 A.2d at 192; *see* Majority Slip Op. at 16. However, *Rashawn H.* did not interpret the necessity to adhere to the expressly enumerated factors in § 5-323(d), or the consideration of "other factors" referenced within the statute. *Rashawn H.*'s focus was on drawing the distinctions between custody and TPR proceedings. The extensive legislative and historical analysis in *Rashawn H.* provides guidance on the appropriateness of TPR proceedings, but not necessarily on how juvenile courts should approach a finding of parental unfitness or exceptional circumstances. Notwithstanding the unsettled areas of *Rashawn H.*, its discussion makes clear that "[t]o justify a TPR judgment, therefore, the focus must be on the continued parental relationship, not custody." *Rashawn H.*, 402 Md. at 499, 937 A.2d at 190.

The *Rashawn H.* Court highlighted three elements to distinguish the heightened standards in TPR proceedings that are not utilized when considering child custody. *Id.* at 498, 937 A.2d at 190. First, a presumption exists that it is in the best interest of the child to maintain the parental relationship, which may be rebutted by a showing of unfitness or exceptional circumstances that would make the continued relationship detrimental to the child's best interest. *Id.* Second, this presumption must be established by clear and convincing evidence, a heightened burden than the preponderance of the evidence standard applied in custody cases. *Id.* at 499, 937 A.2d at 190. Third, the Court reasoned that the General Assembly limited a juvenile court's discretion by expressly including factors to determine exceptional circumstances that justify termination of a parental relationship. *Id.* Considering the clarification of those elements, the Court remanded the matter for the

5

juvenile court "to make clear and specific findings with respect to each of the relevant statutory factors[.]" *Id.* at 505, 937 A.2d at 194.

Upholding the juvenile court's application of custody factors in TPR proceedings is fundamentally at odds with the three critical elements outlined in *Rashawn H.* and subsequent decisions relying on *Rashawn H.*'s elements. The first element in *Rashawn H.* dictates that it is in the best interest of a child to maintain the parental relationship. Unless there is a finding of unfitness or exceptional circumstances, the parental relationship should not be terminated. In the custody context, unfitness "means an unfitness to have *custody* of the child, not an unfitness to remain the child's parent; exceptional circumstances are those that would make parental *custody* detrimental to the best interest of the child." *Id.* at 498, 937 A.2d at 190 (emphasis in original). In applying the factors enunciated in Fam. Law § 5–323(d), the juvenile court could not find parental unfitness or exceptional circumstances that would result in a detriment to H.W. Additional factors may be considered in the analysis, as long as the best interest of the child is "the touchstone for courts in TPR cases." *In re Adoption of Ta'Niya C.*, 417 Md. 90, 111, 8 A.3d 745, 757 (2010). As the Majority points out, those factors should "relate to the statutory inquiry regarding a parent's unfitness or the presence of exceptional circumstances that make continuing the relationship detrimental to the child's best interests." Majority Slip Op. at 17. The custody factors considered by the juvenile court indicated *supra*, are directly correlated to a child's best interest in the custody of a particular caretaker. Utilizing custody factors may ultimately bolster a finding of exceptional circumstances where one may not have existed. Although the Majority posits that the juvenile court's reliance on

6

custody factors did not taint the TPR decision, there is, ultimately, no way to guarantee that it did not. Juvenile courts should be cautioned against improperly piecemealing factors from other statutes or cases to bootstrap the desired goal of terminating a parent's rights.

The second element from *Rashawn H.* similarly leads to a conclusion that custody factors have no place in a TPR proceeding. A heightened burden of proof reflects the seriousness of TPR proceedings. Because a TPR proceeding could result in a complete rescission of the parental-child relationship, the specific factors enumerated in Fam. Law § 5–323(d) are necessary measures to ensure protection of a parent's fundamental right to raise a child. *See Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060 (2000) (protecting the right "to make decisions concerning the care, custody, and control of their children[ ]" under the Fourteenth Amendment of the United States Constitution.).

As the Court in *Rashawn H.* articulated in its third element, the express inclusion of factors to consider in Fam. Law § 5–323(d) indicates that the General Assembly sought to focus a juvenile court's discretion when determining exceptional circumstances that justify termination of a parental relationship. "[I]t is clear that the General Assembly's extensive list of factors, when considered in the light of the standing presumption favoring parental rights, reflect the spirit that termination is an alternative of last resort, and is not to be taken lightly." *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 715, 12 A.3d 130, 138 (2011). This Court recognized that TPR proceedings are "different in kind and not just in degree[ ]" from custody disputes, *Rashawn H.*, 402 Md. at 496, 937 A.2d at 188 and that the General Assembly "set forth criteria to guide and limit the court[.]" *Id.* at 499, 937 A.2d at 190. Although similar factors may be relevant in both contexts, the ultimate

7

inquiries are distinct. Much like we have explained that "a child's prospects for adoption must be a consideration independent from the termination of parental rights," *In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 317, 872 A.2d 662, 679 (2005), similarly custody is too. Although a juvenile court may consider a host of other relevant factors, the statutory directive must be followed.

In sum, it was reversible error for the juvenile court to consider the four custody factors utilized to find exceptional circumstances. "[I]f no parental unfitness or exceptional circumstances exist, there is no need to inquire further as to where the best interest of the child lies." *Ta'Niya C.*, 417 Md. at 105, 8 A.3d at 753 (internal quotations and citations omitted). If the court could not find parental unfitness or exceptional circumstances, the court's analysis should have gone no further. Accordingly, I would affirm the judgment of the Court of Special Appeals.